848 A.2d 652

In re **THOMAS H.**

**No. 92, Sept. Term, 2003.**

Court of Appeals of Maryland.

May 10, 2004.

Peter F. Rose, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for appellant.

Janet Hartge (Legal Aid Bureau, Inc., on brief), C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

This case, we thought, presented the question of whether, and in what manner, a juvenile court, in its consideration of a petition to declare a child in need of assistance, can find, conclusively, that a man previously adjudicated to be the father of the child, is not the father.

The single issue presented to us by appellant, Robert S., in an appeal that he noted in December, 2002, is whether the Circuit Court for Anne Arundel County, in considering his exceptions to a juvenile master's recommendation in a child in need of assistance (CINA) case, acted prematurely in concluding that appellant was not the father of the child alleged to be in need of assistance and, on that ground, striking his exceptions and declaring that he was no longer a party in the case. All parties now agree, and correctly so, that the court *did* err, at least because, at that stage of the proceeding, prior to finding the child to be CINA, the court had no authority to determine Robert's paternity or lack thereof.

Regrettably, by failing to perfect his 2002 appeal from that order, by seemingly accepting his non-paternal status and remaining content to participate as a permissive intervenor in further Circuit Court proceedings for a period of ten months, and, when final judgment was eventually entered, by neglect-

ing to file an appeal from that judgment, Robert has effective-ly abandoned his earlier appeal. We shall dismiss the appeal.

## BACKGROUND

The child in question, Thomas H., was born on February 8, 1991 to Karen H. At some point in 1995, a paternity action was filed in the Circuit Court for Anne Arundel County by or on behalf of Karen against Robert, alleging that he was Thomas's father. On November 6, 1995, the court entered a consent order declaring Robert to be Thomas's father and charging him with supporting the child. That order has never been modified or set aside, at least not directly.

On March 7, 2002, the Anne Arundel County Department of Social Services (DSS) filed a petition alleging that, because his parents were unable or unwilling to give him proper care and attention and because Robert had sexually and physically abused the child, Thomas was a CINA. The petition stated that Thomas was then living with Robert and that Karen's whereabouts were unknown. Thomas was immediately placed in shelter care pending proceedings in the juvenile court.

Evidence taken by the juvenile master in hearings scattered over four days from April 8 to May 23, 2002, indicated that Thomas lived with Robert for all or most of his life, that Karen, along with two of her four other children, was in and out of the home, sometimes with a new boyfriend, it being entirely unclear when she was there and when she was not. She testified that she had lived most recently with Thomas in Robert's home from mid-June, 2001 to January, 2002, although there was other evidence indicating that she had left the home in the Fall of 2001. A foster care report filed later in the proceeding stated that, as a result of a CINA case in 1997, Robert had been awarded custody of Thomas and that Thomas had remained with Robert thereafter. The records relating to any CINA or other proceeding in 1997 are not included in the record now before us, and there is nothing in what *is* before us to confirm, negate, or explain the statement in that foster care

report that, as a result of that proceeding, Robert had been awarded custody of Thomas.[1]

Other evidence revealed that DSS had investigated complaints of abuse or neglect on both Karen's and Robert's part, dating back at least to July, 2001, in some of which abuse or neglect was found "indicated." The investigations concerning Robert showed that Karen was aware of the various acts constituting sexual abuse on his part but did nothing to protect the child. On June 18, 2002, the master filed a report in which she concluded that the parents were unable or unwilling to give proper care and attention to Thomas's needs, that the child needed court intervention, and that he should be removed from the home "because of the inappropriate sexual conduct of his father, and his mother's failure to intervene to protect the child."

While testifying before the master, Karen was asked by the DSS lawyer if she knew who Thomas's father was, and she responded, "Well, the way Tommy looks and change and everything, I believe that [Roy H.] is the gentleman that's in the back with the red shirt on *may be* ...." (Emphasis added). Based apparently on that one equivocal response and disregarding the 1995 consent order that Karen identified and acknowledged and which was in evidence, the master's own characterization of Robert as Thomas's "father," and the fact that Roy had never claimed to be the father, had no relationship with Thomas, and had indicated no desire to have custody of him, the master included among her several recommenda-

---

1. The report, labeled "Child Information Sheet" was prepared by the State Foster Care Program and was attached to the Foster Care Review Board report that was transmitted to the court on September 13, 2002 and stamped as received by the judge on September 20, 2002. That was after the various master's hearings in April and May of 2002, of course, but before the court acted on the master's recommendations in November, 2002. The report states:

"The family has a long history with this agency and Tommy was in care once before in 1997 when [Robert] filed an Ex–Parte against Tommy's mother [Karen], and was awarded custody with the provision that DSS visit the home at least every other day. [Robert] had a past sex offense conviction. The Court dismissed both the Shelter and CINA petitions and Tommy has remained with his father."

tions that "parents shall cooperate and the father shall submit to paternity testing as scheduled by the [DSS]." The master did not explain, and it is unclear to us, who she meant by "parents" and "father." The only father at that point would seem to be Robert.

On June 21, 2002, Robert filed exceptions, complaining about the proposed CINA finding, the recommendation that Thomas be removed from the home, and the paternity testing. Without waiting for those exceptions to be heard or any court order to be signed, and notwithstanding that "[t]he proposals and recommendations of a master for juvenile causes do not constitute orders or final action of the court," (Maryland Code, CJP § 3-807(d)(1)), DSS, on June 24, proceeded on its own to have paternity testing for Thomas, Karen, and Roy, although not for Robert.[2] When the test results showed a 99.99% probability that Roy H. was Thomas's biological father, DSS, treating that as conclusive proof that Robert was *not* the father, filed contemporaneous motions (1) to have Roy declared Thomas's father, to add him to the CINA proceeding as the child's father, and to remove Robert as the parent and party, and (2) to strike Robert's exceptions on the ground that he was not Thomas's father and therefore not a proper party to the proceeding. In a memorandum filed in support of its motions, DSS contended that the juvenile court had authority in CINA proceedings to make determinations of paternity, that, although Robert had been previously named by Karen as the father, there was no "conclusive proof" that he was, in fact, the father, and that "[a]s a result of blood tests [Robert] was excluded as the biological parent of Thomas."

The court conducted a hearing on the motions on October 4. DSS pressed its position that Robert was not a proper party. Robert argued that he had *not* been excluded as the father, that he had been adjudicated as Thomas's father, and that the

---

2. The record shows that on October 4, 2002—more than three months *after* the testing was done on Roy, Karen, and Thomas—the court entered an order directing *Robert*, Karen, and Thomas to undergo paternity testing. It does not appear that *that* testing was ever done.

court was without "jurisdiction" to determine otherwise. The court made no immediate ruling other than to order Robert, over his objection, to undergo paternity testing. On October 15, Robert filed a written opposition to the DSS motions, again claiming that he was Thomas's father. Appointed counsel for Thomas, who appeared to be expressing her own wish rather than that of Thomas, asked the court to grant the DSS motions.

On November 18, 2002, the court entered an order (1) declaring that Robert was not the natural parent of Thomas within the meaning of the CINA law and that he therefore was not a proper party to the action, (2) dismissing his exceptions for lack of standing, (3) denying DSS's motion for declaration of paternity on the ground that such a declaration was premature, (4) based on the DSS averment that Roy "has been conclusively established to be the natural parent of Thomas through DNA testing," adding him as a necessary party [3], and (5) remanding the matter to the master to conduct a new evidentiary and disposition hearing.

In reaching some of those conclusions, the court acted under Maryland Code, § 3–801(u)(1) and (t) of the Courts & Jud. Proc. Article (CJP). Section 3–801(u)(1) defines a "party," for purposes of a CINA proceeding, as a child who is the subject of the petition, the child's "parent, guardian, *or custodian*," the petitioner (usually DSS), and an adult charged under CJP § 3–828 with contributing to the child's CINA status. (Emphasis added). Without any reference to the Foster Care Review Board report indicating that Robert had been awarded custody of Thomas, which was then before the court, and notwithstanding Robert's claim that he had, in fact, been Thomas's custodian, the court dismissed out of hand any notion that he was Thomas's guardian or custodian and examined only whether he qualified as a "parent."

---

**3.** The court did not explain its inconsistency in granting the DSS motion to disqualify Robert and add Roy as a party because of a conclusive determination that Roy, rather than Robert, was Thomas's father but denying the motion to declare Roy the father on the ground that the motion was premature.

Section 3–801(t) defines "parent" as "a natural or adoptive parent whose parental rights have not been terminated." The court noted that § 5–310 of the Family Law Article, dealing with adoptions, defines the term "natural father" as including a man who "has been adjudicated to be the father of the individual," but it reached what it regarded as the "inescapable conclusion" that the Legislature did not intend for a "natural father" under that definition to be included as a "natural parent" for purposes of CJP § 3–801(t). Upon that conclusion—that a natural father was not a natural parent—the court determined that Robert was not Thomas's "natural parent" and for that reason was not a proper party.

On December 10, 2002, Robert filed an appeal from that order, but proceedings continued apace nonetheless in the Circuit Court. Having been ousted as a party, Robert moved to intervene in the case and to stay all proceedings until the appeal was resolved. The court denied the motion to stay and permitted the master to determine the motion to intervene. Robert did not seek a stay from the Court of Special Appeals. The master denied the motion for intervention and conducted a new adjudicatory and disposition hearing in February, 2003. At the conclusion of the hearing, which Karen did not attend and at which Robert was not permitted to participate, the master again recommended that Thomas be declared CINA and that he not be returned home to Robert, but committed to DSS for out-of-home placement.

Robert did nothing to pursue his appeal which, in light of the denial of his motion for stay, would seem to assume a special importance. Instead, he again filed exceptions, principally from the denial of his motion to intervene. In ruling, the court looked to Maryland Rule 11–122, which provides for intervention both of right and permissively in juvenile cases. Section (a) of the Rule states that, upon timely application, a "parent" not served with original process *shall* be permitted to intervene for any purpose. Confirming its belief that Robert was not Thomas's "parent," the court held that he was not entitled to intervention as of right. Section (b) states that a person, other than a "parent," who is seeking custody or

guardianship of the child *may* be permitted to intervene for dispositional purposes only, subject to certain conditions. The court found that Robert met the criteria of section (b) and that "[t]o deny him permissive intervention under these unusual circumstances would amount to an abuse of discretion." Accordingly, it granted permissive intervention and remanded the matter, once again, to the master.

Robert moved the court to reconsider its denial of intervention as of right, based on § 9–205 of the Family Law Article, which is part of the Maryland Uniform Child Custody Jurisdiction Act. Section 9–205 provides that, before entering a decree under that Act, an opportunity to be heard must be given to "any person who has physical custody of the child." Robert argued that, prior to the CINA petition, he had physical custody of Thomas and was therefore entitled to participate. The court concluded that § 9–205 did not apply to CINA proceedings and therefore denied the motion.

On remand, the master, in effect, confirmed everything she had done earlier. Because Robert was no longer seeking immediate custody of Thomas, she terminated his intervention, iterated her belief that Thomas was a CINA and that reunification with Robert was not advisable, and recommended that custody be awarded to DSS for out-of-home placement. On October 2, 2003, the court ratified the findings of the master and signed the recommended order. It is that order that declared Thomas a CINA and, subject to the continuing jurisdiction of the court, terminated the matter. No appeal was taken from that order. The only appeal before us is the one filed in December, 2002, from the November 18, 2002 order declaring that Robert was not the natural parent, custodian, or guardian of Thomas and dismissing his exceptions without ruling on them.

## DISCUSSION

As we observed earlier, this case is infected with a number of lapses, mostly procedural, some substantive. In finding that Robert could not qualify as a party under CJP, § 3–

801(u), the court, beginning with its November, 2002 order, and the master and the court in all of the subsequent proceedings, ignored evidence that Robert had been granted custody of Thomas in 1997, which, if true, would give him party status under that section regardless of whether he was also a parent. In absolute derogation of the 1995 judicial determination that Robert was Thomas's father, the master recommended that Robert, Karen, and Thomas undergo paternity testing; Robert did not ask for that to be done, nor did Roy or Karen. Without waiting for Robert's exceptions to be heard, or, indeed, obtaining any other court order, DSS rushed to have everyone but Robert tested and, based on the test results for Roy, contended, and persuaded the master and the court to accept, that Robert had been conclusively shown not to be the father, which, under the law, was not the case.

As noted, all parties agree that the court erred, in its November, 2002, order, in finding that Robert was not Thomas's father, but only because, in their view, the finding was premature. They appear to be correct at least for that reason and perhaps for other, more important ones as well.

The basic law regarding the determination of paternity is set forth in Title 5, Subtitle 10 of the Family Law Article (FL), although provisions in the Estates and Trust Article (ET) and the Courts & Jud. Proceedings Article (CJP) are also relevant. ET § 1–208 provides that a child born to parents who have not participated in a marriage ceremony with each other shall be considered the child of "his father" only if the father: (1) has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings; (2) has acknowledged himself, in writing, to be the father; (3) has openly and notoriously recognized the child to be his child; or (4) has subsequently married the mother and acknowledged himself, orally or in writing, to be the father. Robert satisfied the first three of these alternative methods, the most significant being the judicial determination, in a paternity action brought by or on behalf of Karen, that he was Thomas's father.

FL § 5–1005 permits an equity court to determine the "legitimacy" of a child pursuant to ET § 1–208. Except as otherwise implicit from § 5–1038, which permits a declaration of paternity to be set aside under certain limited circumstances, the function of the statute is to provide a means of establishing fatherhood, by one of the methods set forth in ET § 1–208, by rebuttable presumption arising from the fact that the mother was married at the time of conception (FL § 5–1027), by affidavit of parentage (§ 5–1028), by blood or genetic testing (§ 5–1029), or by other evidence presented at trial. The statute contemplates a bilateral action, between the mother or the Child Support Enforcement Administration on behalf of the mother, as the complainant, and the one alleged father, as the one respondent, for it permits the impleader or joinder of other alleged fathers only if and when the court finds that the man alleged in the petition to be the father is not, in fact, the father. *See* FL § 5–1039. The statute does not appear to envision a roulette wheel, with two or more men charged, tried, and placed at risk of a paternity determination simultaneously.

Section 5–1029 permits the court, on its own initiative or on motion of the Child Support Enforcement Administration or any party to the proceeding, to require the mother, child, and alleged father to submit to blood or genetic testing to determine "whether the alleged father can be excluded as being the father of the child." FL § 5–1029(b). The laboratory report is admissible in evidence if (1) definite exclusion is established, or (2) the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%. FL § 5–1029(f)(1). A laboratory report received into evidence that establishes a statistical probability of the alleged father's paternity of at least 99.0% constitutes a "rebuttable presumption of his paternity." FL § 5–1029(f)(4).

Section 5–1032 provides that, if the court finds that the alleged father is the father, it shall enter an order declaring him to be so. With but two exceptions, FL § 5–1038 makes a

declaration of paternity in an order entered under § 5–1032 final. Such an order may be modified only:

"1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order."

The second of those provisions allows the man who previously was declared to be the father to undergo testing in order to establish, contrary to a declaration that has otherwise become final, that he is *not*, in fact the father. *See Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000); *Walter v. Gunter*, 367 Md. 386, 788 A.2d 609 (2002). We have never considered whether any other man, belatedly claiming to be the father, may collaterally attack a final order entered in a paternity case and thereby disestablish someone else's paternity, and we need not do so in this case, as neither Roy nor any other man has made such a claim or sought that relief.

The Courts and Judicial Proceedings Article contains three relevant provisions dealing with paternity in CINA cases. CJP § 3–819(c)(2) permits the court, in making a disposition that either follows or is part of a finding that the child is, in fact, a CINA, to determine "paternity of a child in accordance with § 3–803(b) of this subtitle." Section 3–803(b), in turn, provides that the court has concurrent jurisdiction over "paternity of a child whom the court finds to be a CINA." Section 3–822(a) requires the court, at each CINA hearing, to inquire into the identity and address of each parent of the child and, in that regard, to inform the parents present of available means to establish paternity "if not yet established," and, "[i]f appropriate," to refer parents to an appropriate support enforcement agency "to establish paternity and support." Section 3–822(e) permits the court to order a parent to cooperate with an appropriate support enforcement agency to establish paternity and child support and to "[m]ake a finding

of paternity in accordance with Title 5, Subtitle 10, Part VI of the Family Law Article." Part VI of subtitle 10 comprises §§ 5–1032 through 5–1044.

When all of this is read in context, it is clear that, when the court entered its order of November 18, 2002, it had no authority to determine that Robert—the adjudicated father of Thomas—was not the father and was not a proper party to the proceeding. If acting under CJP §§ 3–819(c)(2) and 3–803(b), the determination was at least premature, in that the court had not yet found Thomas to be a CINA. That alone made the order erroneous, at the time it was entered. More substantively, we question whether (1) in light of the final and unmodified order that Robert was the father, and the absence of any claim by Roy to the contrary, the court had any authority, under the circumstances of this case, to go behind that order and disestablish Robert's paternity, and (2) there was, in any event, sufficient evidence to exclude Robert as the father. Robert had not been tested. The laboratory report with respect to Roy indicated a strong probability that he was Thomas's father, but it did not serve conclusively to exclude Robert. No one knows what a test of Robert may have shown. The authority in CJP § 3–822(e)(2) to make a paternity determination requires that it be made in accordance with FL, Title 5, Subtitle 10, Part VI, which includes FL § 5–1038. As noted, that section makes the earlier adjudication final unless the adjudication was still subject to the revisory power of the court, which it was not, or a blood or genetic test "establishe[d] the exclusion of [Robert]," which it did not. At best, under FL § 5–1029, it created a rebuttable presumption that Roy was the father—a presumption that Robert was not given the opportunity to rebut.

The entire issue of paternity was relevant only to the question of whether Robert was a proper party to the proceeding, and, as we noted, if he had been granted custody of Thomas, as indicated in the Foster Care Review Board report, he would have party status in any event, regardless of whether he was Thomas's father. The custody issue, which (1) was in the case, (2) could easily have been resolved, possibly by the

court's own records, and (3) may have made the paternity issue moot, was, instead ignored.

This mess is complicated further by Robert's failure to pursue his December, 2002 appeal—the only one that is before us. That appeal was never perfected in conformance with the applicable rules, and the blame for that cannot be laid solely at the hands of the clerk's office. Maryland Rule 8–411 required Robert, who was exempt from the pre-hearing conference procedure set forth in Rules 8–205 and 8–206, to order a transcript of proceedings within 10 days after noting his appeal. There is no indication in this record that that was done. Transcripts were not ordered until July 10, 2003, seven months later. Absent the preparation of transcripts, there is no way that the record could be transmitted to the Court of Special Appeals within sixty days after the noting of the appeal, as required by Maryland Rules 8–202 and 8–412.[4] Because the record was never transmitted, no briefing schedule was ordered by the Court of Special Appeals. Whatever dereliction there might have been on the part of the clerk, *see* n. 4, *ante,* the fact is that Robert simply allowed his appeal to languish. He sought a stay of proceedings from the juvenile court but never sought one from the Court of Special Appeals, as he could have done under Maryland Rule 8–422. Instead of perfecting the appeal, Robert was content to remain in the Circuit Court for an additional ten months, until that court

---

4. In the record is an affidavit from the Juvenile Department Appeals Clerk, dated July 7, 2003, acknowledging that the record was due to be transmitted to the Court of Special Appeals on February 10, 2003, and stating that it was not transmitted because "when filed the notice of appeal was staple[d] along with other motions that were filed in the above case" and that "[t]he clerk did not see the appeal and therefore did not give it to the appeals clerk to process." Although the affidavit further states that "[t]he appellant was not responsible for this delay," the fact is that (1) the notice of appeal itself was not only date-stamped by the Juvenile Department on December 10, 2002, and therefore must have been seen by the clerk, whether stapled to other motions or not, but was docketed and was therefore a matter of public record, and (2) counsel for Robert surely knew that, without the transcripts, the clerk could not have transmitted the record in conformance with the rules in any event.

entered its order of October 2, 2003, declaring Thomas a CINA.

Robert neglected to file an appeal from the 2003 order. He wants now to use the appeal noted in December, 2002, to contest the ruling of November 18, 2002, dismissing him as a party, on the ground that, *at that time,* having not yet found Thomas to be a CINA, the court had no "jurisdiction" to render a paternity determination. He does not contest that which we ourselves have questioned—the authority of the juvenile court, in the circumstances of this case, to make a paternity determination even *after* finding Thomas to be CINA. The sole argument in his brief is that "the court acted without subject matter jurisdiction in relation to addressing the issue of paternity in general because at this stage of the proceedings (exceptions taken from the Master's recommendations) Thomas H. was still only *alleged to be* a CINA and had not yet been *found to be* a CINA. Under § 3–803(b)(1)(i), *supra,* the trial court's concurrent jurisdiction to determine paternity extends only to a child who the court *finds to be* a CINA. This has not yet happened."

Apart from the fact that the lack of authority asserted by Robert is one of timing rather than a want of subject matter jurisdiction, the court now *has* declared Thomas to be a CINA and, by ratifying the master's recommendation that Robert's status as an intervenor be terminated, confirmed his non-party status. Because no appeal has been taken from that determination, whether erroneous or not, it is now final. By failing to pursue his 2002 appeal in a proper fashion and by failing to appeal from the ultimate judgment, Robert has precluded any meaningful appellate relief. Notwithstanding our concern about the manner in which this case proceeded below, we shall dismiss the appeal.

APPEAL DISMISSED; APPELLANT TO PAY THE COSTS.