**HEADNOTE:** *In re B.C. & In re Adoption/Guardianship of B.C.*, Nos.: 1744 & 2342, September Term 2016.

**PARENT AND CHILD>EVIDENCE OF PARENTAGE>IN GENERAL>PRESUMPTIONS AND BURDEN OF PROOF>AS TO PATERNITY; PRESUMED FATHERHOOD; IN GENERAL**

**INFANTS>DEPENDANCY, PERMANENT CUSTODY; AND TERMINATION OF RIGHTS; CHILDREN IN NEED > APPEAL AND REVIEW > IN GENERAL**

**PARENT AND CHILD>EVIDENCE OF PARENTAGE>IN GENERAL>PRESUMPTIONS AND BURDEN OF PROOF>AS TO PATERNITY; PRESUMED FATHERHOOD; IN GENERAL**

B.C. was born in June of 2014 at Johns Hopkins Hospital to C.R. and G.C., the appellant and presumptive father. Shortly after B.C.'s birth, it was clear that he had been exposed to cocaine *in utero*. As a result, he remained in the hospital's care for two weeks following his birth. Subsequently, he was sheltered by the Department of Social Services ("the Department"). Although G.C. maintained from the beginning that he was not the biological father of B.C., he is named as the child's father on his birth certificate by virtue of being married to C.R. at the time of B.C.'s birth.

While in the Department's care, B.C. was found to be a Child in Need of Assistance ("CINA") because he was born exposed to cocaine and neither his mother, nor presumptive father, was able to provide him with appropriate care and supervision. Although reunification was the ultimate goal, the Department had concerns that neither G.C. nor C.R. was fit to parent the child. Accordingly, at the request of G.C., B.C.'s permanency plan was changed to relative placement for adoption with G.C.'s niece in North Carolina. While B.C. was living with G.C.'s niece, G.C. became threatening, and on one occasion, visited the child without the Department's knowledge or permission. As a result, the niece refused G.C. any further contact with B.C. and precluded him from visiting the child.

After being barred contact with B.C., G.C., requested a paternity test believing that if it was proven that he was not the child's biological father, the child would be removed from his niece's home and returned to Maryland. The genetic test results confirmed that G.C. was not B.C.'s biological father. Accordingly, the Department filed a motion to determine exclusion of paternity which was granted by the Circuit Court for Baltimore County sitting as the juvenile court. Several months after, the Department filed a judicial notice of paternity exclusion requesting that G.C. be stricken as a party in the CINA and Termination of Parental Rights ("TPR") proceedings. That motion was also granted by the juvenile court.

Held: Judgment Affirmed.

The Juvenile court did not err in granting the motion to determine exclusion of paternity or in granting the motion for G.C. to be stricken as a party in the CINA and TPR proceedings. Pursuant to *Sieglien v. Schmidt*, 224 Md. App. 223 (2015), the presumption of paternity can be rebutted after a proceeding showing that to disestablish parentage is in the best interest of the child. A juvenile court has *parens patriae* authority and frequently exercises it in guardianship proceedings, especially when a child has been adjudicated as a CINA. To that end, the court has the authority to determine an outcome as long as it is in the best interest of the child.

MD. CODE ANN., CTS & JUD. PROC., §3-802(a) imparts upon the Department the responsibility to "ensure that reasonable efforts were made to prevent placement and achieve a permanency plan for the child." All of this is done consistent with the child's best interest in mind. Here, there are a number of factors that indicate that the Department acted within the child's best interest. Chief among them is that G.C. requested the paternity test to rebut the presumption of paternity. Even had he not, the fact remains that he is unable to provide B.C. with the appropriate care that he requires, thus his rights would likely have been terminated in a subsequent TPR proceeding.

In the instant case, because B.C. was adjudicated as a CINA, does not have a stable home environment with G.C., and has no established relationship with G.C. – therefore, G.C. is not a de facto parent, the juvenile court exercised its discretion in disestablish paternity because it was not in the child's best interest. Thus, there was no abuse of discretion.

The court's holding does not suggest that the Department has the authority to initiate a process to rebut the presumption of paternity vested in a presumptive father as a result of Estate and Trusts Article §1-2016. Rather, when a presumptive father proves that he is not the biological father of the child and where it is in the best interest of the child to be adopted by a non-relative, the Department is allowed to file such a motion.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

———————————————————————
CONSOLIDATED CASES
———————————————————————

No. 1744
September Term, 2016

IN RE B.C.

———————————————————————

No. 2342
September Term, 2016

IN RE ADOPTION/GUARDIANSHIP OF B.C.

———————————————————————

Kehoe,
Berger,
Reed,

JJ.

———————————————————————

Opinion by Reed, J.

———————————————————————

Filed: November 30, 2017

On September 16, 2016, the Circuit Court for Baltimore County, sitting as a juvenile court ("the juvenile court"), disestablished and terminated the presumptive paternity of G.C. ("Appellant") to minor B.C. ("child" and "B.C." interchangeably). The court's decision followed from the Department of Social Services' ("the Department") filing of a motion for a finding of non-paternity. Prior to the Department's motion, Appellant requested a paternity test that proved that he was not the child's biological father. Subsequently, Appellant timely appeals two orders of the juvenile court, the order in the Child in Need of Assistance ("CINA") proceeding, which excluded him as the presumptive father of B.C. and the order striking him as a party in the Termination of Parental Rights ("TPR") proceeding. In doing so, he presents three questions for our review, which we have consolidated and rephrased for clarity as follows:

1. Did the juvenile court abuse its discretion where it determined it would be in the best interest of the child to deny Appellant paternity of B.C., at the request of the Department of Social Services, although he was married to the child's mother at the time of his birth?

2. Did the juvenile court err where it excluded Appellant as a party in the termination of parental rights case based on the prior order disestablishing paternity?

For the reasons that follow, we answer Appellant's questions in the negative and affirm the judgment of the juvenile court.

**FACTUAL AND PROCEDURAL BACKGROUND**

B.C., a minor, was born to C.R. ("Mother") in June of 2014, at Johns Hopkins Hospital. Shortly after his birth, it was clear to doctors that he had been exposed to cocaine *in utero*. B.C. remained in the hospital for two additional weeks following his birth, to detox and was subsequently sheltered by the Department of Social Services ("the Department"), on June 25, 2014. Although Appellant and Mother maintained from "the very beginning that Appellant was not biologically [B.C.]'s father," he is named as B.C.'s father on his birth certificate by virtue of being married to Mother at the time of B.C.'s birth.

B.C. came into the Department's care via a Shelter Care Order, and was placed in an agency foster home. On August 14, 2014, the juvenile court found B.C. to be a Child In Need of Assistance ("CINA") because he had been born exposed to cocaine and neither his mother, his maternal grandmother, nor Appellant was able to provide him with appropriate care and supervision. Both Mother and Appellant were able to visit the child as supervised and arranged by the Department. At the permanency planning hearing, it was agreed that the final plan would be reunification with his parents. Although reunification was the ultimate goal, the Department had concerns that neither Appellant, nor C.R., was fit to parent the child. Accordingly, at the request of Appellant, B.C.'s permanency plan was changed to relative placement for adoption with Appellant's niece ("Niece") in North Carolina.[1]

---

[1] As with the initial plan, both parents were allowed "liberal and supervised [visitation with the child] as arranged by DSS." Moreover, both parents were ordered that they should

2

The arrangement for B.C. to stay with Niece was initially amenable to all parties; however, while B.C. was staying with Niece, Appellant "became threatening and said aggressive things to [her]." As a result of Appellant's aggressiveness, Niece feared for the safety of her home and changed her address and phone number. Further, in June, Appellant brought mother, without Niece's and the Department's knowledge or permission, to visit the child. Niece objected to Appellant bringing C.R. because of her "unaddressed mental health…and substance abuse issues." As a result of that visit, Niece refused Appellant any future contact with B.C. and precluded him from visiting with the child. During this time, Appellant was facing criminal charges in New York. It is unclear the nature of these charges but they range from drug charges and physical coercion. Appellant also had an open warrant for his arrest, to which it is unclear whether he has surrendered to the New York Police Department. After being barred contact with B.C., Appellant requested a paternity test, believing that if it was proven that he was not the child's biological father, the child would be removed from Niece's home.

A paternity test was conducted on February 19, 2016, and the test results confirmed what Appellant and mother had already known; that Appellant was not B.C.'s biological father. Shortly after taking the paternity test, Appellant was charged, arrested, and incarcerated in the state of New York. As a result of the genetic test's findings, the Department filed a petition for guardianship of B.C., with the right to consent to adoption,

---

obtain and maintain gainful employment and provide evidence of an income sufficient to support the child. They both were to participate in substance abuse treatments. Mother was required to participate in mental health treatments.

and B.C. was returned from North Carolina to Maryland and placed with his original foster family. On September 16, 2016, the Department filed a Motion to Determine Exclusion of Paternity, which the juvenile court granted. Several months later, the Department filed a Judicial Notice of Paternity Exclusion and requested that Appellant be stricken as a party in the CINA and TPR proceedings; the juvenile court granted the motion on December 5, 2016.

The juvenile court conducted hearings on both of the Department's motions. Appellant argued that although he was not the biological father of B.C., he should be recognized as B.C.'s father by virtue of having been married to the child's mother at the time of the child's birth, his name was on the child's birth certificate, and he held himself out to be the child's father. The juvenile court determined that Appellant had neither lived in the same household as the child, nor established a "bonded, dependent relationship parental in nature." Accordingly, the juvenile court concluded that it was in the child's best interest to exclude Appellant as a parent. It is from these orders that Appellant appeals.

## STANDARD OF REVIEW

The fundamental right of a parent, to parent their child, without interference from the State, is protected by the Fourteenth Amendment to the U.S. Constitution. *See Boswell v. Boswell*, 352 Md. 204,217-20 (1998)("A parent has a fundamental right to the care and custody of his or her child. The United States Supreme Court has upheld the rights of parents regarding the care, custody, and management of their children…"); *see also, In re Mark M.,* 365 Md. 687, 705 (2001)("A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court."). This

4

fundamental right cannot be infringed upon by the State, or any State agency, unless clearly justified. *See In re Adoption/Guardianship No. 95195062/CAD In the Circuit Court for Baltimore City*, 116 Md. App. 443 (1997)("Termination of parental rights, however, implicates the fundamental constitutional right to raise one's own child. Because this right is 'so fundamental… it may not be taken away unless clearly justified.'") (internal citations omitted). Because the termination of parental rights is total, irrevocable, and leaves the parent with no right to visit or communicate with the child,[2] it is held to three different, but interrelated, standards: (1) a clearly erroneous standard, applicable to the juvenile court's factual finding; (2) a de novo standard, applicable to the juvenile court's legal conclusion; and (3) "when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [juvenile court's] decision should be disturbed only if there has been a clear abuse of discretion." *See In re Yve S.*, 373 Md. 551, 586 (2003)(citing *Davis v. Davis*, 280 Md. 119 (1977)).

Moreover, when the Department seeks to terminate parental rights, without the consent of the parent, the standard is whether the termination of rights would be in the best interest of the child. *In re Abigail C.*, 138 Md. App. 570 (2001). To determine what is in the child's best interest, the court must consider the factors enumerated in Md. Code Family

---

[2] *See M.L.B. v. S.L.J.*, 519 U.S. 102, 118 (1996)("the object of the [termination of parental rights] proceeding is 'not simply to infringe upon [the parent's] interest,' the court recognized, 'but to end it;' thus, a decision against the parent 'works a unique kind of deprivation.' For that reason, '[a] parent's interest in the accuracy and justice of the decision…is…a commanding one.'")(internal citations omitted).

Law § 5-323 (c).  Additionally, when the child has been adjudicated CINA, the court must consider the factors set forth in FL §5-323(d) as well. *See In re Adoption/Guardianship No. T97036005,* 358 Md. 1 (2000)("The best interest of the child must be determined only after the court considers the required factors listed in F.L. §5-[323](c) and (d)."). Because the trial court's decision may forever deprive the parent of his or her fundamental parental rights, this Court must make express findings of fact respecting all of the applicable statutory factors of FL § 5-323.

In reviewing the juvenile court's decision

> [o]ur function ... is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the chancellor's determination that it would be in the best interest of [the child] to terminate the parental rights of the natural [parent]. In making this decision, we must assume the truth of all the evidence, and of all of the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court.

*In re Abigail C.,* 138 Md. App. 570, 587 (2001) (quoting *In re Adoption No. 09598,* 77 Md. App. 511, 518 (1989)).  In reviewing the juvenile court's decision, we must first determine whether the court considered the statutory criteria; second, whether its factual determinations were clearly erroneous; third, whether the court applied the law; and finally, whether it abused its discretion in making its determination.  *Id.*

### DISCUSSION

## I.  September 15, 2016 Hearing Terminating Appellant's Parental Rights

### A. Parties' Contentions

6

Appellant argues that the juvenile court abused its discretion when it determined that he was not B.C.'s presumptive father. First, he contends, because he was married to the child's mother at the time – making him the presumptive father, was identified as the father on the child's birth certificate, and no other individual claimed to be the child's father the court abused its discretion in terminating his parental rights. Second, Appellant maintains that because it was not he that took legal action to disestablish his paternal rights, but the Department, that the Department acted outside of the scope of its authority and did not have standing to challenge Appellant's paternity. Lastly, Appellant argues that even if the court had the authority to disestablish paternity, the court abused its discretion because it was not in the child's best interest.[3]  We disagree.

Both Appellees – the child and the Department ("Appellees"), respond that because Appellant is not B.C.'s biological father, he does not "have a basis for a finding of paternity under any statutory law in Maryland." Moreover, Appellees contend that Appellant is not a de facto parent. Thus, the court properly exercised its discretion in disestablishing Appellant's paternity.

---

[3] One concern of the Appellant is that B.C. "will have one less resource for placement. He could not seek child support from the Appellant, inherit the Appellant's estate, or be eligible for the Appellant's Social Security benefits." Not so, there exists no law in Maryland that precludes a person from assigning his estate to a person who is a non-relative. Unfortunately, because B.C. is not the child of Appellant, he would not be a survivor of Appellant's Social Security Benefits. *See Understanding the Benefits*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/pubs/EN-05-10024.pdf (last visited, October 10, 2017)(Stating benefits can be paid to unmarried children that meet a certain criteria.)

**B. Analysis**

**The Presumption of Legitimacy**

In answering Appellant's questions, we first turn to the presumption of legitimacy. Appellant suggests that the presumption finds its origins in the *Magna Carta Libertatum.* It is not quite that ancient; the presumption of legitimacy was first recognized in *Goodright v. Moss*, 2 Cowp. 591, 98 Eng. Rep. 1257 (1777). The case, written by Lord Mansfield, sets forth the rule for which he is the namesake. He ruled:

> The law of England is clear, that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage… it is a rule, founded in decency, morality, and policy, that they shall not be permitted to say after marriage that they have no connect, and therefore that the offspring is spurious; more especially the mother, who is the offending party.

Maryland courts have consistently followed Lord Mansfield's rule. The Court of Appeals held in *Dayhoff v. State*, 206 Md. 25, 32 (1954):

> In this state the accepted rule is that where a child is born of a married woman neither the husband nor the wife is a competent witness to prove non-access at a time when according to the laws of nature the husband could have been the father of the child…

*See also, Sider v. Sider*, 334 Md. 512, 526 (1994)("In Maryland, a child born to a married woman is presumed to be the offspring of the woman's husband."). The presumption has also been codified into Maryland law. *See* MD. CODE ANN., FAM. LAW ("FL") §5-1027(c) ("There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."); *See also,* MD. CODE ANN., EST. & TRUSTS, §1-206(a) ("E.T.")("A child born or conceived during a marriage is presumed to

8

be the legitimate child of both spouses… a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents.")

Over time, the presumption has evolved and relaxed, allowing the presumption to be rebutted upon the showing of evidence that the child could not have possibly been the husband's child by proving non-access; *see* FL §5-1027(4) ("The court determines that the presumption…has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception."); or by a showing of DNA evidence. *See Turner v. Whisted*, 327 Md. 106, 116 (1992)("Where child is presumed legitimate, best interest of the child should be considered before ordering blood tests.")(citing *McDaniels v. Carlson,* 108 Wash.2d 299, 738 (1987); *see also, Monroe v. Monroe*, 329 Md. 758, 767 (1993)("If it would not be in the child's best interest to have the blood tests reveal that a man who has been a *de facto* father in the whole of the child's life is not the biological father… that assessment may only be made by considering the entirety of the relationship between the child, the [mother] and [Mr. Monroe].")

Additionally, the use of a man's name on a child's birth certificate creates yet another presumption of paternity. *See* FL §5-3A-06 (a)(3)("Unless a court excludes a man as the father of a child, a man is the father if the man is named as the father on the child's birth certificate and has not signed a denial of paternity.").

In the instant case, Appellant was married to Mother at the time of the child's birth. Further, Appellant's name appears on the child's birth certificate. Therefore, Appellant was

9

the presumed father of the child prior to the court's ruling disestablishing paternity. Appellant contends that although he knew he was not the child's biological father, he has "held himself out openly as B.C.'s father," and has "stood up and openly and notoriously from the time he knew of [the child's] conception said 'I will be your father.' He stepped forward to do that, he wants to do that."[4]

Further, Appellant cites *In re Thomas H.,* 381 Md. 174 (2004), as persuasive authority to show that the juvenile court abused its discretion in declaring the non-paternity of Appellant. In *In re Thomas H.*, the appellant, Robert S., appealed an order that declared that Robert, the putative father, was not Thomas' natural parent and dismissed his exceptions to the juvenile master's recommendation that the child was a CINA.[5] Thomas

---

[4] The Juvenile Court ruled that Appellant did not meet the *Conover v. Conover*, 450 Md. 51, 74 (2016), factors necessary to be considered a de facto parent. Under the de facto parent factors, Appellant must prove: (1) the biological parent consented to, and fostered, Appellant's formation and establishment of a parent-like relationship with the child; (2) Appellant and the child lived together in the same household; (3) Appellant assumed obligations of parenthood by taking significant responsibility for the child's care, education, and development. This includes, contributing towards the child's support, without expectation of financial compensation; and (4) Appellant has been in a parental role for a length of time sufficient to have established a bonded and dependent relationship, parental in nature.

After applying the factors to Appellant's case, the court found: "[Appellant] and the child did not live in the same household for the majority of the minor child's life;" "there's no evidence that [Appellant] assumed any responsibility for the child's care, education and development including support;" "the [Juvenile] Court does not find that there has been a significant length of time to have established with the child a bonded, dependent relationship, parental in nature, and the Court in a light most favorable to [Appellant,] going to the de facto parent analysis doesn't find that [Appellant] has met that analysis.

[5] The court does not indicate whether Robert S. was married to the child's mother at the time of his birth. In fact, a court entered a consent order declaring Robert to be the child's father.

10

was alleged to be a CINA because Robert had sexually and physically abused the child. Moreover, it was found that Thomas' parents were unable or unwilling to give him proper care and attention. During the CINA hearing, the child's mother mentioned that she did not believe that Robert was Thomas' father, but another man, Roy H. The court then recommended that a genetic test be conducted to determine whether Roy was the child's father. The test proved that there was a 99.99% probability that Roy was the father. The Department treated this as proof that Robert was not the father and filed four motions to: have Roy declared as the father; add Roy to the CINA proceedings; remove Robert as the parent; and strike Robert's exceptions. The appeal was ultimately dismissed by the Court of Appeals because there had been no appeal taken from the court's determination.

Appellant does not appreciate a vital difference between *In re Thomas H.,* and the instant case. In the former, Robert never asserted that he was not the child's father and objected to the court's order requiring blood testing. Here, Appellant himself raised the issue of B.C.'s paternity and obtained genetic testing in order to disrupt B.C.'s placement with Niece. Had Appellant not requested the paternity test, he would have remained the presumptive father pursuant to E.T. §1-206(a). The simple fact remains: the basis for the juvenile court in denying Appellant's paternity rights over the child was based on his request, and subsequent undergoing of genetic testing, to prove that he was not the child's biological father. We are not unsympathetic to Appellant's desire to be in the child's life, however, Appellant requested and subjected himself to the genetic testing and was not compelled to do so by the court or the Department.

11

**Best Interest of a Child in Need of Assistance**

As mentioned, the presumption of paternity may be rebutted after a proceeding showing that to disestablish parentage would be in the best interest of the child. *See Sieglein v. Schmidt*, 224 Md. App. 222, 243 (2015)("in Maryland, the presumption of legal parentage established under [Md. Code, ET,] §1-206 may only be rebutted after a showing that proceedings to disestablish parentage are in the *best interest of the child*.") (emphasis added). In this instance, the court's ordering of a paternity test to determine whether the presumed father is the biological father, must be in the best interest of the child. *See Kamp v. Department of Human Services,* 410 Md. 645, 661 (2009)(*quoting Evans v. Wilson*, 382 Md. 614, 629 (2004))("…prerequisite to ordering a blood or genetic test, the trial court should be satisfied that good cause for the testing has been shown, that 'blood or genetic testing would be in the *best interest of the child.*'")(emphasis added).

The Court of Appeals of Maryland, in *Turner v. Whisted,* 327 Md. 106, 114 (1992), described the criteria for determining the best interest of a child in paternity cases:

> [C]onsideration of the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs. An important consideration is the child's past relationship with the putative father. Finally, other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history.

(internal citations omitted). *Id.* Moreover, the "father's commitment to the responsibilities of parenthood and interest in establishing his status as the child's natural father balanced against…the interest in protecting the integrity of the familial relationship already formed." *Kamp*, 410 Md. 645 at 661. Maryland courts have held that where it is not in the best

12

interest of the child, it will not disestablish the paternity of a presumptive or putative father. *See Kamp*, 410 Md. at 645 (the divorced father sought a finding of non-paternity of a child born during his marriage, the Court of Appeals determined that a finding of non-paternity was not in the best interest of the child because the child lived with and was supported by the presumptive father for thirteen years); *see also*, *Ashley v. Mattingly*, 176 Md. App. 38 (2007)(presumptive father requests a DNA test to establish that he was not the biological father to relieve himself of child support obligations, this Court remanded the case because it was not determined whether it was in the child's best interest to have a DNA test done); *Miles v. Stovall*, 132 Md. App. 71 (2000)(Former husband requested a DNA test to determine that he was not the biological father of a child born during his marriage, this Court reversed the proceeding allowing the father to submit to a DNA test).

When a child has been determined to be a CINA,[6] and has been removed from the care of its biological parents, the court must determine a plan that would establish a sense of permanency in the child's life. *See In re Adoption of Jayden G.*, 433 Md. 50, 82 (2013)("A critical factor in determining what is in the best interest of a child is the desire for permanence in the child's life."). Thus, when reunification with a parent is not viable, the next best thing is adoption. However, unless there is consent from the biological parent, there can be no adoption, and thus no permanency "until the natural parent's rights to the

_____

[6] A child is determined to be a CINA when the child has been abused, neglected, has a developmental disability, mental disorder; and the child's parents, guardian, or custodian are unable, or unwilling, to give proper care and attention the child's needs. *See* MD. CODE ANN., CTS. & JUD. PROC. §3-801(f). In the instant case, B.C. was determined to be a CINA shortly after his birth on August 14, 2014.

13

child are terminated, which is done when the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors that [TPR] is in the best interest of the child." (internal quotations marks omitted). *Id.* at 85.

The State, in its capacity as *parens patriae*, has the inherent authority to care for children and persons with disabilities because they cannot care for themselves. A juvenile court has the same unique authority, and frequently exercises it in guardianship proceedings. *See Wentzel v. Montgomery Gen. Hosp. Inc.*, 293 Md. 685, 702 (1982). In CINA cases, that discretion is more proactive:

> …particularly in a [CINA case], the court's role is necessarily more pro-active. The juvenile court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation and determine the correct means of fulfilling a child's best interest.

(internal quotation marks omitted). *In re Najasha B.*, 409 Md. 20, 33 (2009). To that end, the court has the authority to determine an outcome as long as it is in the best interest of the child. In fact, if the juvenile court finds that after considering the factors that it is in the best interest of a CINA to determine parental rights, the juvenile court has the authority to grant the Department's petition for guardianship, and the Department, by right may, consent to the adoption of the child. *See In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. 666 (2002). Accordingly, we hold that the juvenile court did not abuse its discretion when it determined that disestablishing paternity of Appellant was in the best interest of the child. We shall explain.

Because B.C. is a CINA, we must look at both the factors for determining the best interest of the child as well as the factors enumerated for establishing whether the child is

a CINA. First, we look at the stability of the child's current home environment. B.C. has never lived with his biological mother and Appellant and currently resides with the foster family he was assigned shortly after his birth. Thus, the most stable home environment is not with Appellant, but with the child's current foster family. Next, we explore the child's past relationship with Appellant. The record has established that while Appellant has visited the child intermittently during the first year of his life, there has been no relationship established. The child is currently three, and as the child has asserted in his brief, would not "be able to pick him out if he walked through the door." It is clear to this Court, that absent a few interactions, neither parent has had contact with the child over the course of the three years he was in foster care. Thus, Appellant does not have a prior relationship with B.C., which would tend to prove that living with Appellant would be in the child's best interest.

Moreover, if we turn to our previous decision regarding Appellant's de facto parent status, *supra* n. 4, it is clear that had there been some relationship established the juvenile court's ruling would have been different. Because there has been no familial relationship between B.C. and the Appellant, we hold that disestablishing paternity was in the best interest of the child, regardless if no other person was willing to assume responsibility of the child. Further, a finding that it was not in the best interest of the child would not establish the permanency that the child requires as a CINA. Appellant has been incarcerated for a majority of the child's life and there has been no evidence to suggest that Appellant is equipped to provide B.C. with the adequate care he needs. A finding showing

that it was in the best interest of the child to disestablish paternity in this particular case is not an abuse of discretion.

**Authority of the Department of Social Services**

Appellant contends that even though he asked for, and submitted to a DNA test, "he did not take legal action to disestablish paternity." As such, he argues, "the Department…lacked standing to challenge paternity." Further, Appellant argues "to permit a local department of social services involved in a CINA matter to challenge the paternity of a child born into a marriage and who, therefore has a mother and legal father, is contrary to the legislative intent of paternity statutes." Finally, Appellant maintains that his presence was an impediment to the efforts to have the child adopted.

Appellant cites a number of cases to show that it is uncommon for the Department to challenge the paternity of a child born in wedlock. The only case that Appellant cites where the department has requested a finding of non-paternity is *In re Thomas H.*, which we have already determined is not parallel to the instant case.

The Department has an ability to care for a child that has been adjudicated as a CINA. The Department has the responsibility to "ensure that reasonable efforts were made to prevent placement and achieve a permanency plan for the child." MD. CODE ANN., CTS & JUD. PROC. §3-802(a). All of this is done consistent with the best interest of the child in mind. *Id.* Here, there are a number of factors that indicate that the Department acted in the best interest of the child: (1) B.C. was adjudicated as a CINA shortly after his birth, and neither parent opposed; (2) B.C. never lived with or was supported by Appellant during his three years of life; (3) Appellant requested the paternity test to rebut the presumption

16

of paternity; and (4) even if Appellant had not requested a paternity test, and remained the presumptive father, the fact remains that he is unable to provide B.C. with the appropriate care that he requires, thus his rights would likely have been terminated in a TPR proceeding.

This Court is not suggesting that the Department has the authority to initiate a process to rebut the presumption of paternity vested in Appellant as a result of E.T. § 1-206(a). Such an attempt would be improper, as it side-steps the procedural and substantive protections for parents in TPR proceedings, set forth in Family Law Article, Title 5, Subtitle 3. This Court is, however, holding that when a presumptive father proves that he is not the biological father of a child, and where it is in the best interest of the child to be adopted by a non-relative, the Department is allowed to file such a motion. We shall explain.

A CINA court's authority to decide paternity derives from CJP § 3-822(e)(2), which authorizes the court "to make a finding of paternity in accordance with Title 5, Subtitle 10, Part VI [("Part VI")] of the Family Law Article."

As the Court of Appeals noted in *In re Thomas H.,* 381 Md. 174, 185 (2004), CINA courts have the power to determine paternity in order to identify the proper parties to the CINA proceeding. The plain language of § 3-822(e), indicates that a CINA court's authority in this regard, must be exercised in accordance with the provisions of Part VI. Part VI of Subtitle 10, deals with orders to be entered after the court determines that the alleged father is, in fact, the father of the child.

When CJP § 3-822 and Part VI are read in conjunction, as they should be, it is clear that the primary purpose of § 3-822 is to authorize the court to identify the father in cases where paternity has not been acknowledged. Then, after having identified the father, to make appropriate provisions for child support. CJP § 3-822 is not a mechanism by which a Department of Social Services can initiate a paternity inquiry as a means of terminating the parental rights of an individual in Appellant's situation, who is presumed to be the father of B.C., by virtue of his marriage to Mother at the time of the child's birth. But this was not the situation confronted by the circuit court in this case.

By seeking genetic testing, Appellant undertook to rebut the presumption of paternity, which he enjoyed as a result of ET § 1-206(a). He was successful because the genetic testing proved, as he knew it would, that he was not B.C.'s biological father. Part VI provides for this scenario. CJP §5-1039 states:

(a) If the court finds that the alleged father is not the father, *the court may*:
   (1) retain jurisdiction; and
   (2) on its own motion or otherwise, *take any further proceeding that the court considers just and proper and in the best interests of the child*.
(b) Under this section, the court may:
   (1) enter an appropriate order against the mother for the support of the child;
   (2) allow the impleader or joinder of any other alleged father; or
   (3) consider any other matter that may be in the best interests of the child.

(emphasis added).

18

We hold that the court acted within the scope of its authority under §5-1039 when it passed an order declaring that Appellant was not B.C.'s father.[7]

*Conclusion*

Thus, this Court first holds that the juvenile court considered the statutory criteria in determining the child's best interest. Second, we hold that none of the factual determinations were clearly erroneous. Third, we find that the court applied the law to Appellant's case. Finally, we find that the court did not abuse its discretion in making its determination.

## II.  Termination of Parental Rights Hearing

### A. Parties Contentions

Appellant contends that the juvenile court erred when it excluded Appellant as a party in the termination of parental rights case based on the September 15, 2016 hearing disestablishing paternity. Appellant further argues, "if this court agrees with the Appellant's arguments in [the prior issue], it must vacate the order excluding Appellant as the father and not permitting him to participate in the guardianship proceedings.

Both Appellees contend that because the juvenile court did not err in disestablishing paternity of Appellant that the order excluding Appellant must stand. We agree.

---

[7] In his reply brief, Appellant asserts that the court's order "delegitimized" B.C. and therefore violated public policy. We do not agree.  Appellant delegitimized the child when he rebutted the presumption established by ET §1-206(a) by proving that he was not B.C.'s biological father.  The CINA court's order excluding Appellant as B.C.'s father was nothing more than an acknowledgement of the legal consequences of the evidence presented to the court.

19

## B. Analysis

As we have previously held, the juvenile court neither abused its discretion nor erred when it disestablished paternity of Appellant based on the best interest of the child.  As such, the court did not err when it excluded Appellant from the guardianship proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**