*In re R.S.*, No. 3205, September Term, 2018

Filed: August 28, 2019 Opinion by Friedman, J.


**HEADNOTES**:

**Infants > Inter-jurisdictional placement > Interstate Compact on the Placement of Children > Statutory interpretation**

The ICPC does not apply to a juvenile court's out-of-state placement of a child with a noncustodial parent. The ICPC only applies to placements in "foster care or as preliminary to a possible adoption." FL § 5-604(a). A child's placement with a natural parent is neither of these.

**Administrative Law and Procedure > Consistency with statute, statutory scheme, or legislative intent > Invalidation**

Administrative regulations that contradict the terms of a governing statute exceed the agency's authority and are void. Regulation promulgated by the Association of Administrators of the Interstate Compact on the Placement of Children purporting to expand the ICPC to placements with biological parents is invalid because the regulation contradicts the plain language of the ICPC showing that the ICPC only applies to foster care and adoptive placements, neither of which include parental placements.

**Infants > Inter-jurisdictional placement > Interstate Compact on the Placement of Children > Constitutionality**

Because of a parent's fundamental right to parent a child as a matter of federal and state law, the ICPC cannot be used as the sole means to deny the placement of a child with an out-of-state parent. Instead, there must be a judicial determination, based on sufficient evidence, of parental unfitness before a juvenile court can deny an out-of-state parent custody of a child.

Circuit Court for Worcester County
Case No. 23-I-16-000012

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3205

September Term, 2018

_____

IN RE: R.S.

_____

Fader, C.J.,
Friedman,
Zarnoch, Robert A.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Friedman, J.
_____

Filed:  August 28, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The primary issue in this appeal is whether the Interstate Compact on the Placement of Children ("ICPC"), codified at Maryland Code, Family Law ("FL") sections 5-601 through 5-611, applies to a juvenile court's placement of a child with an out-of-state, noncustodial parent. R.S., the child at the center of this CINA[1] appeal, requested that she be placed in the care of her noncustodial father—a Delaware resident—after the juvenile court sustained allegations that her mother neglected her. But in reliance on the ICPC, the juvenile court refused to award father custody of R.S. because a single social worker in Delaware concluded that he was not an appropriate placement option. After the negative ICPC assessment by Delaware, the juvenile court and the Worcester County Department of Social Services ("WCDSS") treated R.S.'s paternal grandparents as the child's only viable placement option.

Only after R.S. and father took an initial appeal challenging the juvenile court's reliance on the ICPC—an appeal that this Court dismissed as interlocutory—did WCDSS change its final recommendation to joint custody of R.S. shared by father and the paternal grandparents. As a result, at a final CINA review hearing, the juvenile court granted father and the paternal grandparents joint legal and physical custody of R.S. over the child's

---

[1] A CINA is a "child in need of assistance." MD. CODE, Courts and Judicial Proceedings ("CJ") § 3-801(g). Maryland defines a CINA as a "child who requires court intervention because: (1) [t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) [t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." CJ § 3-801(f). The statutory scheme for CINA proceedings is primarily set forth at Title 3, Subtitle 8 of the Courts and Judicial Proceedings Article, which we refer to as the "CINA Subtitle."

objection that her father, as a fit parent, was entitled to sole custody. R.S. now challenges that joint custody award, arguing that it was tainted by the juvenile court's and WCDSS's improper reliance on the ICPC to deny father custody of her earlier in the CINA proceeding.

Because we hold that the ICPC does not apply to the juvenile court's placement of a child with an out-of-state biological parent, we vacate the juvenile court's final custody order and remand the matter for further proceedings.

## BACKGROUND

In November 2016, WCDSS removed two-year-old R.S. from the care of her mother, placed the child in shelter care, and filed a petition with the juvenile court alleging R.S. was a CINA due to mother's neglect. WCDSS informed the juvenile court that mother had identified T.S.,[2] a resident of Delaware, as R.S.'s father, although it appeared she had never told him about the existence of the child. WCDSS notified father of the upcoming adjudicatory hearing.[3]

At the December 2016 adjudicatory hearing before a magistrate for juvenile causes,[4] T.S. appeared.[5] He informed the magistrate he had learning disabilities, so he had his father

---

[2] In this Opinion, T.S. is alternately referred to as "father" or "T.S."

[3] While father's name and address appear on the CINA petition filed on November 9, 2016, WCDSS made no mention of him in its accompanying report. A December 2016 report only states that father was notified of the adjudicatory hearing.

[4] CJ § 3-807(b)(1) allows magistrates to conduct hearings in CINA cases. The magistrate's findings and recommendations do not constitute orders or final action of the court until adopted by the juvenile court. CJ § 3-807(d)(1)-(2).

[5] Because this was his first appearance, father did not yet have counsel.

2

with him for assistance. WCDSS noted that T.S., while named a party in the case, had only just learned that R.S. might be his daughter. He was willing to take a paternity test, which the court ordered. The magistrate and all parties agreed that the court could adjudicate the petition allegations but should wait to complete the final disposition hearing until the paternity test results were received. The magistrate repeatedly pointed out that the CINA petition allegations "have nothing to do with [father,]" a point echoed by WCDSS. After sustaining the petition allegations concerning mother's neglect of R.S., the magistrate emphasized that "if, in fact, [T.S.] is determined to be the father of [R.S.] then of course he is a party of the case and has all of the rights and responsibilities, at least according to the Court and state, that a biological parent has."

At a disposition hearing in January 2017, the juvenile court found T.S. to be R.S.'s biological father after receiving the paternity test results. The court ordered WCDSS to provide father substance abuse and psychological evaluations, as well as parenting classes. The court also ordered a homestudy to be completed for the paternal grandparents' home and directed WCDSS to conduct a family involvement meeting with the parties. The court granted father supervised visits with R.S. and indicated the visits could be unmonitored once father demonstrated his ability to care for R.S. The court continued the disposition hearing to give father a chance to prove his fitness to parent R.S.[6]

---

[6] There is no transcript of this hearing. While the courtroom minutes and the court's findings and orders do not mention the ICPC, the order that a homestudy be completed for the paternal grandparents' home in Delaware, and R.S.'s filing of a memorandum with the juvenile court the next day arguing that the ICPC does not apply to a noncustodial parent

In its report for the continued March 2017 disposition hearing, WCDSS indicated that father had attended every scheduled weekly visit with R.S., who was slowly adjusting to her new relationship with him. WCDSS noted that father willingly accepted guidance and direction to improve his interactions with R.S. He successfully completed mental health and substance abuse evaluations and was not told he needed any treatment. He also maintained stable, appropriate housing and employment. WCDSS further reported that father and the paternal grandparents agreed during a January 2017 family involvement meeting to undergo an ICPC[7] homestudy so that R.S. could be placed with them in Delaware.[8] A court order was needed to expedite the homestudy. WCDSS asked the court to continue the disposition hearing so the ICPC process could be completed.

At the hearing, R.S.'s counsel argued that R.S. was not a CINA because the petition allegations only concerned mother's neglect of R.S. and the evidence showed father was willing and able to care for the child. As a result, counsel asked the magistrate to dismiss the case and place R.S. in father's care pursuant to CJ § 3-819(e),[9] asserting that the ICPC

---

strongly suggest that the ICPC was discussed at this hearing. As we will discuss later, it was error for the juvenile court to require father to prove his fitness.

[7] The ICPC requires a state to get approval from the "appropriate public authorities" in another state before sending a child to that state for "placement in foster care or as preliminary to a possible adoption." FL § 5-604(a), (d). As we discuss in Section II.A, the ICPC should not have been applied to father because a child's placement with a natural parent is not a foster care or preadoptive placement.

[8] Throughout the CINA proceeding, father either lived with his parents or nearby at his grandmother's home in Delaware, just north of the Maryland state line.

[9] CJ § 3-819(e) states, "If the allegations in the petition are sustained against only one parent of a child, and there is another parent available who is able and willing to care

4

did not apply. The magistrate responded that when it adjudicated the petition, "that [was] an adjudication of the child for purposes of facts sustained against both parents, *even if the father was not involved in it*, *even if there were no allegations specifically against him*."[10] The magistrate stated the relevant question was whether a parent was "able or willing to give proper care and attention *at the time of adjudication*," and concluded the ICPC applied now that the case was at disposition. The magistrate then stated that she already knew father's position on these issues. In response, father asked the court to issue an order expediting the ICPC homestudy.

In a June 2017 report, WCDSS reported that father was having weekly unsupervised visits with R.S. and completing a parenting course with WCDSS. He had never missed a visit with R.S., who now accepted him as her father. R.S. told father she loved him, gave

---

for the child, the court may not find that the child is a child in need of assistance, but, before dismissing the case, the court may award custody to the other parent."

[10] During this exchange concerning whether facts were sustained against father at the adjudicatory hearing, WCDSS emphasized that father had no relationship with R.S. before the CINA case began and WCDSS did not believe it was appropriate to immediately send R.S. to live with father simply because "we don't have any facts sustained." As we will discuss below, this is wrong. CJ § 3-819(e) does not limit itself to parents who have prior involvement with a child; instead, the parent must just be "able and willing to care" for a child. CJ § 3-819(e). Then WCDSS said, "Well, actually the facts sustained are that there's not been any relationship." This, too, is wrong. As we also discuss below, the juvenile court never sustained petition allegations against father. The specific petition allegations sustained, which are found in the November 9, 2016 Shelter Hearing Court Report, make no mention of father—consistent with the magistrate's comments at the December 2016 adjudicatory hearing that the petition allegations "have nothing to do with [father]." The March 13, 2017 courtroom minutes also reflect that the "facts were sustained as to Mother." Moreover, the record does not disclose that WCDSS ever moved to amend the CINA petition to allege facts against father.

him kisses, and wanted to talk with him on the telephone. R.S. was also staying overnight with father on the weekends at the paternal grandparents' home, where father lived. The Delaware social worker who was completing the ICPC homestudy informed WCDSS, however, that she would be denying father as a placement option. The social worker was concerned about father's "memory loss," noting that he sometimes forgot to follow up with her. She opined this "disability" would impede him in following through with appointments for R.S. The Delaware social worker concluded the paternal grandparents, instead, would be an appropriate placement and was working on completing their homestudy. As a result, WCDSS recommended that the court adopt a plan of relative placement with the paternal grandparents and order reunification services for the parents.

At the June 2017 final disposition hearing, R.S.'s counsel repeated that father was entitled to custody of R.S. under CJ § 3-819(e) and that the ICPC did not apply to the placement of a child with a noncustodial parent. Father also argued that he was willing and able to care for R.S., disputed that he had any memory issues that would interfere with his ability to care for her, and requested custody of the child. WCDSS argued the ICPC applied for purposes of disposition. The magistrate said she agreed with R.S.'s counsel that a child is not a CINA if the court finds one parent fit. But the magistrate emphasized that the petition allegations were sustained in December 2016 when father had no relationship with R.S., and the magistrate concluded it would have been inappropriate to give custody of R.S. to father at that time. Turning to the current circumstances, the magistrate stated, "[A]t this point for me to go back and say dad is fit and we should dismiss the CINA I think is simply, it's not what reality is for us today." The magistrate went on, "I make *no finding*

6

*as to [father's] ability to care for this child.*" The magistrate noted that the ICPC worker in Delaware, however, concluded that father was "not an appropriate caregiver." As a result, the magistrate concluded that R.S. was a CINA, recommended out-of-home placement in foster care coupled with 28-day-long visits for R.S. in the paternal grandparents' home, and set the matter for a permanency plan hearing.[11]

In August 2017, WCDSS reported that it was providing reunification services to mother and the paternal grandparents; no mention was made of reunification services for father. R.S.'s 28-day-long visits in the paternal family home were going well. WCDSS observed that R.S. was particularly happy on these extended visits to see father, whom she called "'daddy.'" WCDSS recommended that R.S.'s permanency plan be relative placement with the paternal grandparents pending final ICPC approval from Delaware.

At the August 2017 permanency plan hearing, R.S.'s counsel argued once again that R.S. should be placed in father's sole custody. Counsel repeated that the court had not found father unfit and that the ICPC should not apply to fit parents. The magistrate agreed that father had always been "compliant" and had "jumped right in." But the magistrate found the ICPC applied to R.S.'s possible placement with father as soon as R.S. was "adjudicated a CINA and the Court took jurisdiction." The magistrate concluded that R.S. should be placed for custody and guardianship with the paternal grandparents once the

---

[11] As with all the hearings held before a magistrate in this case, the juvenile court adopted in full the magistrate's findings of facts, conclusions of law, and recommendations as to appropriate dispositional orders.

ICPC homestudy was completed, commenting that father could proceed with a custody complaint in Delaware later.

At a November 2017 review hearing, WCDSS informed the magistrate that it was still awaiting final ICPC approval from Delaware for placement of R.S. with the paternal grandparents. WCDSS's report again noted that father had "complied with all that has been asked of him." R.S.'s counsel repeated that father should be granted custody of R.S. and that the ICPC did not apply to the placement of R.S. with father. Father also asserted that he was "ready, willing, and able to care for" R.S. The magistrate acknowledged that the case was "a little dicey when it comes to" father because he was fully compliant with all the court orders. The magistrate, however, noted that father "got into the case a bit late" because his biological paternity was not established when the case began. The magistrate continued the matter for receipt of the final ICPC report.

After receiving final ICPC approval from Delaware, WCDSS asked the magistrate at a December 2017 hearing to grant the paternal grandparents custody of R.S. and to retain jurisdiction over the child until Delaware recommended closing the case. Father and the paternal grandfather testified that father was fit and able to care for R.S. R.S.'s counsel repeated that the ICPC should not have been applied to father and raised constitutional objections. The magistrate again pointed out that R.S. had been "adjudicated CINA" in December 2016 before father's paternity was established, and the court could not "backtrack" on that finding. The magistrate recognized that after the adjudication,

"investigatory services"[12] were used to see "if there is a fit parent out there." But the magistrate emphasized that father had not appealed the denial of his ICPC homestudy in Delaware and that the magistrate could not "overrule" Delaware's conclusion. The magistrate indicated she might "agree" as to father's fitness but noted that R.S. had already been deemed a CINA. The magistrate recommended that R.S. be placed with the paternal grandparents, found that father had made "excellent" progress, and recommended he receive daily unsupervised contact with R.S. as often as possible.

Father and R.S. filed exceptions to the magistrate's recommendation that custody of R.S. be given to the paternal grandparents, asserting that the ICPC should not have been applied to deny father custody of R.S. After a February 2018 hearing, the juvenile court denied the exceptions and adopted the magistrate's findings and recommendations in full. The juvenile court concluded that R.S. and father waived any objection to the application of the ICPC in the case by not taking exceptions to the magistrate's earlier recommendation ordering an ICPC homestudy. In addition, the juvenile court found that the ICPC applies to the placement of a child with an out-of-state parent. The court concluded the ICPC was the only avenue for WCDSS to obtain information about father and observed that "no substantive information presented by either father or child['s] counsel … served as a viable alternative for the … ICPC home study."

Father and R.S. appealed the juvenile court's order denying their exceptions, but on January 14, 2019, this Court dismissed the appeal because it was an impermissible

---

[12] The magistrate appears to have been referring to, at least in part, the ICPC process.

9

interlocutory appeal.[13] *In re R.S.*, No. 33, Sept. Term 2018, Slip Op. at 1-4 (filed Jan. 14, 2019) ("*R.S.* I").[14]

Upon remand, the juvenile court held a final review hearing on January 24, 2019. WCDSS's report for the hearing recommended that the court grant custody of R.S. to the paternal grandparents based, in part, on observations of the Delaware social worker—the worker who had denied father's ICPC homestudy—that R.S. was thriving in their care. While not changing her ICPC assessment, the Delaware social worker acknowledged that "'[R.S.] and her father have an inseparable bond.'" At the hearing, WCDSS orally amended its recommendation and asked the court to grant father and the paternal grandparents joint custody of R.S. R.S.'s counsel objected.

A WCDSS social worker testified that father and the paternal grandparents wanted to be granted joint custody of R.S. She testified that she had never seen any evidence that father was unfit or that he should not have sole custody of R.S. Father testified that he preferred sharing custody of R.S. with his parents because he needed their support raising her. But he testified his parents would still help him care for R.S. if he were granted sole

---

[13] While that appeal was pending, the juvenile court held two more review hearings at which WCDSS continued to recommend the paternal grandparents be granted custody of R.S. based on the assessment of the Delaware ICPC social worker. At those hearings, the juvenile court reaffirmed that father's progress in the case was "excellent," and the Delaware social worker also reported that father and R.S. were appropriately bonded.

[14] Although this Court's previous opinion is unreported, we cite to it under Maryland Rule 1-104 as law of the case. MD. RULE 1-104(b)(1).

custody of the child. The paternal grandfather testified that father was fit and proper and that he would have no problem with father being granted sole custody of R.S.

In issuing the requested order of joint custody, the juvenile court found father fit and proper and said it was confident father could care for R.S. if granted sole custody of the child. The court, however, said that it did not understand why R.S.'s counsel objected to the joint custody arrangement because the child "doesn't care about" and "isn't affected by the legal status of the people in her life." R.S., through counsel, timely appealed the juvenile court's custody order.

**DISCUSSION**

R.S. asks us to determine whether the ICPC applies to a juvenile court's out-of-state placement of a child with a noncustodial parent, particularly a parent who has not been found to have abused or neglected the child. This is a matter of first impression in Maryland and an area of significant disagreement among the states that have addressed it. For the reasons discussed below, we hold that the ICPC does not apply to parental placements at all.[15] While we conclude that the statutory language requires this outcome, we also note that the broad application of the ICPC to parental placements in CINA proceedings advocated by WCDSS would have significant constitutional ramifications.

---

[15] Lest there be any confusion, our reading of the plain language of the ICPC, as discussed in Section II.A, shows that it does not apply to parental placements *regardless* of whether allegations of abuse or neglect have been sustained as to the out-of-state parent, sometimes referred to as the difference between an "offending or a nonoffending parent." *In re C.B.*, 188 Cal. App. 4th 1024, 1036 (2010); *In re E.R.*, 239 Md. App. 334, 340 n.4 (2018).

## I. MOOTNESS AND WAIVER

We must first dispel the mootness and waiver arguments pressed by WCDSS. WCDSS argues that the issue of whether the ICPC was incorrectly applied to deny placement of R.S. with father is now moot because, at father's request, the juvenile court granted him joint custody of R.S. with the paternal grandparents and terminated the CINA proceeding. "A case is moot when there is no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." *Suter v. Stuckey*, 402 Md. 211, 219 (2007). We conclude, however, that there continues to be an existing controversy about the proper terms of the final custody order and that the matter, therefore, is not moot.

In particular, R.S.'s counsel, acting in the child's best interest, has consistently taken the position that father should have been granted sole custody of R.S., a request she repeated at the January 24, 2019 final review hearing. R.S.'s requests that her father receive sole custody of her under CJ § 3-819(e) were repeatedly denied because the juvenile court found that the ICPC applied to the placement of R.S. with father and that, therefore, the court had to defer to the Delaware social worker's assessment that father was not a suitable placement option. As a result, WCDSS and the juvenile court treated the paternal grandparents as if they were the only viable placement option for R.S.

To be sure, at the January 24, 2019 hearing WCDSS backtracked from its position that father was not entitled to custody of R.S. at all, seemingly because of its concession before this Court in the prior appeal that Delaware's views on father's fitness should not

12

be afforded dispositive weight in a Maryland proceeding.[16] *R.S.* I at 1 n.3. But WCDSS continued to recommend that the paternal grandparents be granted custody of R.S., *as well*, based on the views of the same Delaware social worker who had denied father's ICPC homestudy. That is, father was never seriously considered by WCDSS (or the juvenile court) as deserving sole custody of R.S.

Stated differently, we agree with R.S. that the recommendation of joint custody with the paternal grandparents likely would have never been on the table at the January 24, 2019 review hearing but for the juvenile court's application of the ICPC to R.S.'s possible placement with father earlier in the case. *See In re Joseph N.*, 407 Md. 278, 304 (2009) ("This CINA appeal is not moot because a controversy is alive when the subsequent review hearing order may have been influenced by an error made in the earlier review hearing order."). WCDSS claims there is no causal link between the ICPC homestudy ordered on father and the ultimate joint custody award by emphasizing that father chose joint custody at the final review hearing, consistent with his "fundamental right" as a parent "to make decisions concerning the care, *custody*, and control" of R.S. *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (emphasis added). But from our view, this was a false choice given that WCDSS never accorded father's fitness due consideration by recommending that he was entitled to sole custody of R.S. unless, as a fit parent, he *alone* preferred a different arrangement. Thus, we are not persuaded that father's "request" for joint custody at the

---

[16] We do not treat that prior concession as an admission in this appeal that the ICPC should not apply to parental placements.

13

final review hearing undermines a conclusion that there remains an existing controversy between the parties.[17]

Finally, we reject WCDSS's assertion that R.S. waived her right to challenge on appeal the juvenile court's application of the ICPC to her requests for placement with her father. WCDSS suggests R.S. waived this issue because she failed to notice appeals from the initial permanency plan order, the dispositional order declaring her a CINA, or the order directing the ICPC homestudy of father. But WCDSS does not dispute that these earlier orders were interlocutory in nature. *See In re Katerine L.*, 220 Md. App. 426, 437-40 (2014) (recognizing that many orders in CINA proceedings—proceedings that often span years

---

[17] In asserting that this issue is moot, WCDSS also contends that application of the ICPC to father did not prejudice R.S. and that the joint custody arrangement is not detrimental to her. WCDSS's comments echo those statements by the juvenile court at the final review hearing questioning why R.S. should care about "the legal status of the people in her life." *First*, we note that R.S., as a party to the proceeding, is entitled to the assistance of counsel at every stage of the case, including on appeal, and her counsel is obligated to advance "a position that counsel believes to be in the child's best interest[,]" including on matters related to custody. *In re Sophie S.*, 167 Md. App. 91, 94 n.3 (2006) (this Court questioning child's counsel's failure to take a position on appeal regarding the child's custody). This would be a hollow promise indeed if R.S.'s lawyer was not permitted to advocate before this Court about issues affecting who cares for R.S. *Second*, we have no difficulty concluding that R.S. suffered harm by application of the ICPC to her situation, particularly considering that Delaware's negative assessment of her father resulted in R.S. remaining in foster care and significantly delayed her ultimate placement in father's custody, even though the juvenile court never made a finding that he was unfit, unwilling, or unable to care for R.S. (discussed more fully in Section II, *infra*). *Lastly*, as R.S.'s counsel argued, we can see how the joint custody arrangement could be detrimental to R.S. assuming both paternal grandparents disagree at any point with father about the child's upbringing and living arrangements or father moves out of the paternal family home over the grandparents' objection; she has a right to have her father decide. *See Taylor v. Taylor*, 306 Md. 290, 296 (1986) (defining legal and physical custody and noting that where custody is held jointly between *two* parents, "neither parent's rights are superior to the other").

and involve ongoing intervention by the court, including the revisiting of earlier orders—will not meet the conventional definition of a final judgment). Thus, as WCDSS conceded at oral argument, while R.S. may have had the right to appeal some or all of these orders under CJ § 12-303(3)(x) (allowing interlocutory appeals from orders "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order"), she was not obligated to appeal them to preserve her current appellate challenge. Namely, "[o]n an appeal from a final judgment, an interlocutory order previously entered in the action is open to review by the Court unless an appeal has previously been taken from that order and decided on the merits by the Court." MD. RULE 8-131(d). Because we dismissed R.S.'s prior appeal, we have not issued a merits decision on the ICPC question. *R.S.* I at 1-4. There also can be no real dispute that, at every turn, R.S. asked the juvenile court to place her in her father's sole custody and asserted that the ICPC should not apply to that placement decision. Thus, we hold that this appeal is not moot, nor has R.S. waived the arguments that she presents.

Accordingly, we now turn to the question of whether the ICPC controls the juvenile court's out-of-state placement of a child with a noncustodial parent.

## II.  APPLICATION OF THE ICPC TO OUT-OF-STATE PLACEMENTS WITH PARENTS

### A.  The Statutory Language

R.S. argues that, contrary to the juvenile court's conclusion, the plain text of the ICPC shows that it does not apply to the out-of-state placement of a child with a parent because placement with a natural parent is never a "placement in foster care or as preliminary to a possible adoption." FL § 5-604(a). We agree.

15

We review questions of statutory interpretation without deference to the lower court. *Johnson v. State*, 240 Md. App. 200, 205, *cert. granted*, 436 Md. 550 (2019). In interpreting a statute, "we begin with the normal, plain meaning" of the statutory language. *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, we apply the statute as written." *Harrison-Solomon v. State*, 442 Md. 254, 265 (2015) (cleaned up); *see also Arundel Corp. v. Marie*, 383 Md. 489, 502 (2004) ("If there is no ambiguity in that language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends[.]"). But "[e]ven in instances when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (cleaned up); *see also Lockshin*, 412 Md. at 276 ("[T]he plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute."). This Court also "may and often must consider other external manifestations or persuasive evidence … to ascertain the legislative purpose behind a statute." *Blackstone*, 431 Md. at 113-114 (cleaned up).

An interstate compact like the ICPC is an agreement between states "entered into for the purpose of dealing with a problem that transcends state lines." *In re Adoption No. 10087 in Cir. Ct. for Montgomery Cnty.*, 324 Md. 394, 403 (1991) (cleaned up). Such compacts have "characteristics of both statutory law and contractual agreements" and "are enacted by state legislatures that adopt reciprocal laws that substantively mirror one

16

another." *In re Alexis O.*, 157 N.H. 781, 784 (2008) (cleaned up). "The ICPC has been enacted in all fifty states, the District of Columbia and the U.S. Virgin Islands." *In re C.B.*, 188 Cal. App. 4th 1024, 1031 (2010) (cleaned up). The purpose of the ICPC is to "facilitat[e] interstate adoption and increas[e] the number of acceptable homes for children in need of placement." *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 314 (1997); *see also* FL § 5-602(1) (purpose of the ICPC is to ensure a child receives "the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care"). "To accomplish this purpose, the ICPC extends the jurisdictional reach of a party state into the borders of another party state for investigating a proposed placement and supervising a placement once it has been made."[18] *In re Adoption No. 10087*, 324 Md. at 404 (cleaned up).

---

[18] Given the nature and history of the ICPC and its adoption in Maryland, its legislative history might be found in two distinct locations. *First*, the drafting of the nationwide, uniform model language was undertaken under the auspices of the New York Legislative Commission on Interstate Cooperation, and the ICPC's adoption was recommended to state legislatures in 1960 by the Council of State Governments. Bernadette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption*, 68 NEB. L. REV. 292, 295-96 (1989). Those drafting materials have been reviewed by the U.S. Court of Appeals for the Third Circuit, *McComb v. Wambaugh*, 934 F.2d 474, 479-81 (3d Cir. 1991), and as we will discuss below at note 22, support our conclusion that the original drafters did not intend to include parents in the ICPC. *Second*, there is also some legislative history developed at the time of Maryland's adoption of the ICPC in 1975. Acts of 1975, ch. 266 (SB 18). Neither party has offered, nor have we found, any relevant history that would support or refute our analysis. That is not surprising, however, given that the Maryland General Assembly did not draft the language and, given the need for compact uniformity, was actively discouraged from adopting different language. *In re Adoption No. 10087*, 324 Md. at 403 (interstate compacts require states to adopt "essentially identical statutes").

Section 5-604 of the Family Law Article sets forth Maryland's ICPC[19] procedure for sending a child into another state. FL § 5-604. The key disputed provision states, "No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for *placement in foster care or as preliminary to a possible adoption* unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein." FL § 5-604(a) (emphasis added). The sending agency must provide sufficient written notice to the receiving state of the intention to send the child into the receiving state. FL § 5-604(b). In addition, "[t]he child *shall not be sent*, brought, or caused to be sent or brought into the receiving state *until* the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." FL § 5-604(d) (emphasis added).

Certain key terms in section 5-604 are specifically defined in section 5-603 of the Family Law Article. FL § 5-603; FL § 5-604. For example, the Maryland juvenile court (as well as WCDSS) constitutes a "sending agency," FL § 5-603(2), and Delaware is undisputedly the "receiving state" in this case. FL § 5-603(3); FL § 5-604(a). The ICPC also defines "placement" as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution." FL § 5-603(4); FL § 5-604(a).

---

[19] As previously noted, sections 5-601 through 5-611 of the Family Law Article constitute Maryland's adoption of the ICPC.

The ICPC does not define the terms "foster care" or "adoption." *See*, *e.g.*, FL § 5-603; FL

§ 5-604(a).

To be sure, we can see how the definition of "placement" in the ICPC, standing

alone, is somewhat unclear, with its reference to a "family free" home. FL § 5-603(4); FL

§ 5-604(a); *see*, *e.g.*, *In re C.B.*, 188 Cal. App. 4th at 1032 ("'Family free home' is not a

term of art, and its meaning is by no means clear on its face."); *but see In re Alexis O.*, 157

N.H. at 787 ("Although the term 'family free' home is not defined, in context it refers to a

home that provides care for a child similar to that which a family would provide, but that,

unlike a boarding home, charges no fee for this care."). Nonetheless, there is no real

question that natural parents (at least ones whose parental rights have not been terminated)

do not have to adopt their own children, and WCDSS does not suggest otherwise. *See*, *e.g.*,

FL § 5-301(h)(2) (referring to a child's parent and the individual seeking adoption as

distinct parties); FL § 5-352(a)(2)(ii) (noting that an order of adoption relieves "living

parents" of parental rights and duties as to adoptee). Thus, we have no problem concluding

that a placement with a parent is not a placement "preliminary to a possible adoption." FL

§ 5-604(a).

In addition, we agree with R.S. that a placement with a parent is not a "placement

in foster care." FL § 5-604(a). Maryland defines "foster care" as "continuous 24-hour care

and supportive services provided for a minor child placed by a child placement agency in

an approved family home." FL § 5-501(c). Foster care is one form of "*out-of-home*

placement," FL § 5-501(i) (emphasis added), meaning the placement of children "out of

the homes of their biological parents." *In re Yve S.*, 373 Md. 551, 574 (2003); *see also* FL

19

§ 5-524(2) (recognizing that child welfare services are provided, in part, "to *reunite* the child with the child's parent … *after* the child has been placed in foster care") (emphasis added). We therefore conclude that "placement in foster care" also does not encompass a child's out-of-state placement with a parent. FL § 5-604(a). Here again, WCDSS provides no direct statutory argument to the contrary.

Accordingly, we join those states who have held that the ICPC does not apply to the out-of-state placement of a child with a biological parent.[20] *See*, *e.g.*, *In Interest of C.R.-A.A.*, 521 S.W.3d 893, 903 (Tex. App. 2017) ("plain language" of ICPC shows "it is inapplicable to an interstate placement of a child with a parent"); *In re S.R.C.-Q.*, 52 Kan. App. 2d 454, 464 (2016) (same); *In re D.B.*, 43 N.E.3d 599, 604 (Ind. Ct. App. 2015) ("[T]he statute quite plainly provides that it applies only to placement in foster care or a preadoptive home. A biological parent is neither of these."); *In re Emoni W.*, 305 Conn. 723, 734-35 (2012) ("Children in the care of their own parents are not in 'foster care' in

---

[20] The Court of Appeals' decision in *In re Adoption of Cadence B.*, 417 Md. 146 (2010), does not compel a different result. In that case, the Court of Appeals addressed whether a juvenile court erred in terminating reunification efforts and implementing a permanent plan of adoption due to the length of time the child had lived with her foster parents. *Id*. at 150. In affirming, the Court of Appeals pointed out in a footnote that father "hinted" that his efforts to reunify with his daughter had been thwarted by the ICPC because Pennsylvania (the state where father moved while the case was ongoing) refused to certify his home. *Id*. at 158 n.11. The father based his argument on FL § 5-609, which states that the ICPC does not apply when a parent or certain relatives send a child to live out-of-state with another relative or guardian. *Id*.; FL § 5-609. The Court of Appeals pointed out that FL § 5-609 did not apply to the case because the Department of Social Services, rather than father, would have had to send the child to Pennsylvania. *Id*. at 158 n.11. However, the Court of Appeals was not asked to and did not determine the issue presented here—whether the phrase "placement in foster care or as preliminary to a possible adoption" in FL § 5-604(a) includes parental placements. *Id*.

any ordinary sense of that phrase, and parents are not required to adopt their own children."); *In re Dependency of D.F.-M.*, 157 Wash. App. 179, 191 (2010) (same); *In re Alexis O.*, 157 N.H. at 787-788 ("unambiguous" language of ICPC shows it "does not apply to care for a child by his or her natural parent"); *In re Rholetter*, 162 N.C. App. 653, 664 (2004) ("clear and unambiguous" language of ICPC shows it does not apply to placement with biological parent); *Tara S. v. Super. Ct.*, 13 Cal. App. 4th 1834, 1837 (1993) (ICPC only applies to "foster care and possible adoption—neither of which would involve natural parents").[21]

While WCDSS presents no direct argument about the plain meaning[22] of the statutory language found in FL § 5-604(a), it argues that the ICPC must apply to biological

---

[21] States that have concluded the ICPC does apply to the interstate placement of a child with a natural parent include Alabama, Arizona, Delaware, Florida, Massachusetts, Mississippi, New York, and Oregon. *In Interest of C.R.-A.A.*, 521 S.W.3d at 903-04 (collecting cases); *In re C.B.*, 188 Cal. App. 4th at 1027 (collecting cases). Suffice it to say, we are not persuaded by their reasoning.

[22] Although we hold that the language of the ICPC unambiguously does not apply to parental placements, the ICPC's legislative history further supports our position. *See supra* n.18. As the Third Circuit found, "The detailed draftsman's notes, supplied by the Council of State Governments, reinforce the notion that the [ICPC] does not apply to parental placements." *McComb*, 934 F.2d at 481. "These notes explain that the ICPC exempts certain close relatives. This was done … to protect the social and legal rights of the family and because it is recognized that regulation is desirable only in the absence of adequate family control or in order to forestall conditions which might produce an absence of such control." *In re Alexis O.*, 157 N.H. at 788 (cleaned up). It is reasonable to presume that the Maryland General Assembly shared this statement of purpose when it enacted the ICPC, considering the absence of any indication to the contrary in state legislative history, as discussed *supra*, at note 18. *See Messing v. Bank of Am., N.A.*, 373 Md. 672, 685 (2003) (noting that the comments of the drafters of the Uniform Commercial Code, while not "controlling authority, are an excellent place to begin a search for the legislature's intent when it adopted the Code") (cleaned up).

21

parents. *See* FL § 5-611. It directs us to the regulations promulgated by the Association of Administrators of the Interstate Compact on the Placement of Children ("AAICPC") which purport to extend the application of the ICPC to placements with biological parents. In particular, the ICPC provides that "each jurisdiction party to this compact shall designate an officer … who, acting jointly with like officers of other party jurisdictions, shall have power to promulgate rules and regulations to carry out more effectively the terms and provisions of this compact." FL § 5-608; AAICPC HOMEPAGE, https://aphsa.org/AAICPC/default.aspx, *preserved at* https://perma.cc/MY6Y-UPPG?type=image (last visited Aug. 16, 2019) ("Established in 1974 the [AAICPC] was given the authority to carry out the rules and terms of the [ICPC] more effectively."). Following this directive, the AAICPC promulgated Regulation No. 3, which states that the ICPC generally applies to "[p]lacements with parents … when a parent … is not making the placement."[23] ICPC REGULATIONS, https://aphsa.org/AAICPC/AAICPC/ICPC_ Regulations.aspx, *preserved at* https://perma.cc/7FBC-9E3Q?type=image (last visited Aug. 16, 2019) ("Regulation No. 3"), Regulation No. 3(2)(a)(4). It then provides a limited exception to the application of the ICPC to parental placements made by a court when "the

---

[23] WCDSS does not explain and we do not know of any process by which an out-of-state entity can adopt regulations enforceable in Maryland. *See H.P. v. Dep't of Children & Families*, 838 So. 2d 583, 585 n.3 (Fla. Dist. Ct. App. 2003) ("Arguments have been made that Regulation 3 should not be recognized by Florida courts because it was promulgated by an entity outside of Florida and not subjected to the requirements established by this state for the promulgation of regulations."). The sole process by which regulations are adopted in Maryland is set forth in the State's Administrative Procedures Act, codified at Maryland Code, State Government § 10-101, *et seq.*

court places the child with a parent from whom the child was not removed, and the court has no evidence that the parent is unfit, does not seek any evidence from the receiving state that the parent is either fit or unfit, and the court relinquishes jurisdiction over the child immediately upon placement with the parent." Regulation No. 3(3)(a).

We agree, however, with R.S. that Regulation No. 3 is not valid because it purports to impermissibly expand the scope of the ICPC beyond the scope given by the General Assembly. It is well established in Maryland that courts will not "give effect to agency regulations that are inconsistent with or conflict with the statute the regulations are intended to implement." *McClanahan v. Wash. Cnty. Dep't of Soc. Servs.*, 445 Md. 691, 708 (2015) (cleaned up). In such circumstances the regulations "must yield to the statute." *Dep't of Human Res., Balt. City Dep't of Soc. Servs. v. Hayward*, 426 Md. 638, 658 (2012); *see also id*. at 661 (concluding regulation conflicted with statute by "*expanding* the number of categories" of findings the department could make following a child abuse investigation) (emphasis added). In light of our conclusion that the plain language of the ICPC demonstrates that it only applies to foster care and preadoptive placements, neither of which include placements with natural parents, we hold that Regulation No. 3 is invalid to the extent it purports to expand application of the ICPC to out-of-state placements with a parent.[24] *See*, *e.g.*, *McComb v. Wambaugh*, 934 F.2d 474, 481 (3d Cir. 1991) (influential

[24] R.S. points out that, independent of the AAICPC regulations, COMAR 07.02.11.28C provides that "[w]hen a foster child is to be placed out-of-State with a noncustodial parent, … the local department shall ensure that the requirements for an interstate placement are met." WCDSS does not refer to this COMAR provision in arguing that the ICPC applies here, and, thus, reliance on COMAR 07.02.11.28C is waived. Moreover, we decline to enforce it for the same reasons we reject Regulation No. 3. That

case invalidating prior version of Regulation No. 3 for same reasons); *In Interest of C.R.-A.A.*, 521 S.W.3d at 904 (listing states that have rejected application of the ICPC to parents and noting that "these courts reasoned—at least in part—that the plain language of Article III [FL § 5-604 in Maryland] precluded application of the ICPC in parental situations and Regulation 3 is inapplicable because it is contrary to the unambiguous, plain language of Article III").

Finally, our conclusion that the plain language of the ICPC shows it does not apply to parental placements is further bolstered by Maryland's consistent pronouncement that "a parent's interest in raising a child is a fundamental right" under federal and state law. *In re Billy W.*, 386 Md. 675, 683-84 (2005). Indeed, the Court of Appeals has stressed that "[s]uch rights are so fundamental that they cannot be taken away unless clearly justified." *Id.* at 684 (cleaned up). Even in the CINA context, there remains a strong presumption that a child's best interests are served by placement with a parent. *In re Yve S.*, 373 Md. at 572; *see also* CJ § 3-802(a)(3) (one purpose of the CINA Subtitle is to "conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare"). That a court cannot declare a child a CINA if it finds there is a parent who is able and willing to care for the child "reflects Maryland's strong preference that children be placed with a parent[,]" and also validates that, in Maryland, fit biological

---

is, we conclude COMAR 07.02.11.28C is invalid because it, too, purports to expand the ICPC to parental placements contrary to the intent of the General Assembly.

parents, especially, are entitled to custody of their children. *In re E.R.*, 239 Md. App. 334, 340 (2018); *see In re Karl H.*, 394 Md. 402, 414-15 (2006).

But if the ICPC were broadly interpreted to apply to parents, a parent's custodial rights could be taken away without a court ever finding that the parent is unfit. Specifically, the ICPC expressly mandates that the sending agency—in this case, the juvenile court—cannot send the child into the receiving state without the "appropriate public authorities" in the receiving state concluding that the placement is not "contrary to the interests of the child." FL § 5-604(d); *see also* FL § 5-605 (delineating the penalties for violating the ICPC). Under this scheme,

> agency caseworkers have the power to effectively terminate the parent's relationship with the child by finding that the placement would be contrary to the child's interest, a wholly subjective standard. The ICPC denies courts the ability to make the ultimate decision, and the parent is not given an adequate opportunity to appeal[25] the caseworker's determination in either an administrative or judicial proceeding.

Vivek S. Sankaran, *Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children*, 25 YALE L. & POL'Y REV. 63, 80 (Fall 2006). We cannot countenance a system that allows a single social worker

---

[25] Despite the juvenile court's belief that father could simply appeal his ICPC denial in Delaware, the AAICPC emphasizes on its own website that "there is no formal nationwide process to appeal an ICPC denial. States vary as to what, if any, options exist to appeal a denial." ICPC FAQ'S, https://aphsa.org/AAICPC/AAICPC/icpc_faq_2.aspx, *preserved at* https://perma.cc/49CU-TNBB?type=image (last visited Aug. 16, 2019) ("ICPC FAQ'S"), ICPC FAQ'S – Question 11.

(even a well-intentioned social worker) the power to take a child from a fit parent without *any* judicial oversight.

Such a result, however, would logically flow from a broad application of the current version of the ICPC to placements with parents. Indeed, the ICPC's terms provide no express authority for a court to reject a negative ICPC homestudy *even if* the court concludes the evidence shows the out-of-state parent to be fit.[26] *See* FL § 5-604. As eloquently put by the Court of Appeals of Washington, our intermediate equivalent in that state:

> [C]ourts, not administrative agencies or individual social workers, are the ultimate evaluators of a parent's ability to care for his child, and the ultimate decision-makers as to whether placement with a fit parent is in the child's best interests. Yet under regulation 3, when a fit parent is available but an ICPC home study is negative, all discretion is transferred to an administrative agency in the sister state. If the court determines the parent is fit, the ICPC may become an obstacle to the court's ability to act in the best interests of the child.

---

[26] We are not satisfied that the exception to the application of the ICPC to parental placements found at Regulation No. 3(3)(a), quoted, *supra*, at pages 22-23, adequately solves this problem. That exception no longer applies once the court seeks "evidence from the receiving state that the parent is either fit or unfit." Regulation No. 3(3)(a). In further explaining this exception, the AAICPC clarifies that the ICPC is triggered once "the court *or agency* seeks an evaluation of the parent's fitness." ICPC FAQ'S – Question 5 (emphasis added). Thus, even under this exception, once a juvenile court or child welfare agency seeks an evaluation of a parent's fitness, which, as we understand it, typically occurs as part of an ICPC homestudy as happened here, the ICPC provisions then apply and, if followed, divest the juvenile court of authority to override the placement assessment made by the out-of-state public authorities. FL § 5-604(d); ICPC FAQ'S – Question 7 (noting that the "suitability" of a proposed care-giver "is assessed by what is generally referred to as a 'home study'").

*In re Dependency of D.F.-M.*, 157 Wash. App. at 192–93.[27]

Such a system would violate our constitutional responsibility to safeguard parents' fundamental right to raise their children. The need to avoid that result further confirms our determination that the plain language of the ICPC cannot be stretched to apply to parental placements.

B. The Juvenile Court's Application of the ICPC to R.S.'s Requests for Placement with Father

Notwithstanding our statutory holding, our concern about the application of the ICPC in this case—including certain positions WCDSS advanced for why the ICPC had to be used here—merits further discussion.

1. *Finding as to Father's Fitness*

As explained in Section II.A, we are particularly troubled that applying the ICPC to parental placements can result in a parent being deprived of custody of a child without a judicial finding that the parent is unfit. That is just what happened here. Indeed, our review of the record shows that the juvenile court *never* found father to be unfit[28] at any

---

[27] In an opinion that underscores many of the same concerns raised by the *D.F.-M.* Court, Arizona recently concluded that the ICPC cannot be used to deny custody of a child to a fit, out-of-state parent because of the parent's fundamental right to parent his or her child. *Donald W. v. Dep't of Child Safety*, 444 P.3d 258, 270 (Ariz. Ct. App. 2019). While not fully receding from an earlier Arizona decision applying the ICPC to parental placements, the *Donald W.* Court made clear that a "court must determine if the parent is unfit based on the evidence, which may include the results from a home study or denied ICPC." *Id.*

[28] In referring to the lack of a finding that father was unfit, we mean the juvenile court never made a finding that father abused or neglected R.S. or was otherwise unable or unwilling to care for the child. CJ § 3-801(f).

stage of the CINA proceeding. Nonetheless, the juvenile court (and WCDSS) began treating father as if he were unfit early in the case, and this mistreatment was then exacerbated by the misapplication of the ICPC to R.S.'s and father's requests that R.S. be placed with father.

To fully illustrate our point, we start at the adjudicatory hearing. At that hearing—when father's paternity was not definitively established and he was not represented by counsel—the magistrate proceeded to adjudicate the petition allegations, apparently believing that course was appropriate because the allegations (as then conceded by WCDSS) "ha[d] nothing to do with [father]." We recognize that, at that time, neither the juvenile court nor WCDSS had the benefit of our recent decision in *In re E.R.*, 239 Md. App. 334 (2018). There, we addressed what factual allegations a "local department of social services must plead in a CINA petition when it believes that a child's custodial parent is unable to care for the child, but lacks sufficient information regarding the capability of the noncustodial parent." *Id*. at 336. While acknowledging that a social services department cannot always wait to investigate a noncustodial parent before removing a child from a dangerous situation with a custodial parent, we held that the department must plead "*some facts to support its claim that the noncustodial parent is unable or unwilling to assume custody*" of the child, which may just include an allegation that the noncustodial parent "'acquiesced' in leaving the child with the unfit custodial parent." *Id*. at 341-42 (emphasis in original). Here, as was the case in *In re E.R.*, WCDSS did not even include this minimal pleading and never sought to amend the petition to include allegations about the father. *Id*. at 336, 342. The CINA petition only included father's name, address (mother had identified

T.S. as R.S.'s father), and a bare bones allegation that R.S.'s parents "are unable and/or unwilling to give proper care and attention to him/her" and incorporated by reference the facts contained in the November 2016 Shelter Hearing Court Report, which made no mention of father.

Nonetheless, proceeding on the deficient petition would not have been problematic if the juvenile court had then afforded father, as a party to the case, "all of the rights … that a biological parent has[,]" as the magistrate said she would once T.S.'s paternity was conclusively established. *See id.* at 342-44 (holding juvenile court did not err in proceeding on deficient CINA petition when it transferred custody of children neglected by their mother to noncustodial fathers under CJ § 3-819(e)). But at every post-adjudicatory hearing at which R.S. requested to be placed in her father's care, including during the dispositional phase of the case, the magistrate repeatedly stated that the court could not "go back" on the December 2016 finding that R.S. was a CINA, "even if the father was not involved in it, even if there were no allegations specifically against him." That is, the magistrate treated father as if the court had found him unfit despite the court never having made such a finding or receiving any evidence to support such a finding.

In making such comments, the magistrate (and, in turn, the juvenile court) appears to have confused the court's roles during the adjudicatory and disposition phases of the case. During the adjudicatory hearing, the juvenile court determines "whether the allegations in the petition, *other than the allegation that the child requires the court's intervention*, are true." CJ § 3-801(c) (emphasis added); *see also* CJ § 3-817. Admittedly, the factual allegations in the petition should show that the child meets the definition of a

CINA. CJ § 3-811; *In re E.R.*, 239 Md. App. at 339-40. But it is not until the dispositional hearing that the court finally "determine[s] whether a child is a CINA," CJ § 3-819(a)(1), which requires the court to find that the child needs "court intervention because: (1) [t]he child has been abused [or neglected]; and (2) [t]he child's parents … are unable or unwilling to give proper care and attention to the child and the child's needs." CJ § 3-801(f); *see also* CJ § 3-801(m) (defining "disposition hearing" as hearing at which court determines (1) "[w]hether a child is in need of assistance" and (2) the nature of court intervention necessary to protect the child). In other words, the juvenile court did not definitively "find" that R.S. was a CINA at the December 2016 adjudicatory hearing, which would have required the court to make an express finding based on sufficient evidence that father, not just mother, was unwilling or unable to care for R.S. Instead, as the magistrate correctly acknowledged at that hearing (and then disregarded thereafter), the court simply sustained the factual allegations in the petition, which only concerned mother's neglect of R.S.

Consequently, the juvenile court was required during the dispositional phase of the case to make a finding that father was not willing and able to care for R.S. before declaring her a CINA. CJ § 3-819(a)(1), (b)(iii); CJ § 3-801(f)(2). Considering that the allegations in the petition were only sustained against mother, the juvenile court was also compelled at least to evaluate whether to transfer custody of R.S. to father as long as the court found him "able and willing to care for the child." CJ § 3-819(e). Compounding the other errors in the case, however, the juvenile court concluded that the ICPC applied to R.S.'s possible placement with father. Contrary to the magistrate's repeated comments, this was not a

30

timing problem—that, once the adjudication hearing was held, the court could not "go back" to consider father's fitness but had to apply the ICPC. Instead, the ICPC never applied. But operating under an incorrect interpretation of the ICPC, the juvenile court then abdicated its decision-making role entirely and expressly made "no finding as to [father's] ability to care for" R.S. despite declaring her a CINA. In lieu of making the required statutory finding under the CINA Subtitle, the juvenile court deferred to the conclusion of a single social worker in Delaware who concluded that father's alleged memory issues[29] rendered him an inappropriate placement option.[30] And, from that point on (until the final review hearing after the first appeal in this case), the juvenile court continued to refrain from making any finding as to father's ability to care for R.S. despite repeatedly noting his "excellent" progress in the case.

---

[29] While the ICPC social worker referred to father's alleged memory loss issues as a "disability," WCDSS never suggested below (nor does the record support a conclusion) that father's alleged disabilities rendered him unable to care for R.S. Critically, a biological parent's disabilities are immaterial unless and until those disabilities render the parent unwilling, unable, or unfit to care for a child. *See* CJ § 3-801(f).

[30] At oral argument, WCDSS asserted that the juvenile court did make a finding that father was unable and unwilling to care for R.S. at the final disposition hearing. WCDSS directed this Court to the form the magistrate used to document her oral pronouncements, which the juvenile court then adopted as its findings and orders. That pre-printed form, captioned "CINA Adjudication/Disposition Findings and Orders," has a section which verbatim repeats the statutory definition of a CINA, including pre-printed language that states "the child's parents/guardian/custodian are unable/unwilling to give proper care and attention to the child and the child's needs." In light of the magistrate's express statement that she was not making a finding about father's ability to care for R.S., we do not consider this pre-printed language to reflect a judicial determination of father's fitness and ability to care for the child.

31

As discussed in Section II.A, we recognize that the juvenile court's deference to the Delaware social worker's conclusion would have been appropriate if the ICPC did, in fact, apply to parental placements. But this case presents a prime example of why it cannot. Maryland is not and should not be in the business of keeping children out of the homes of their fit parents. The ICPC should not be used to achieve that result when a juvenile court has never found (and the evidence does not support) that a willing parent is otherwise unable to care for a child. CJ § 3-801(f).

### 2.    *The Need to Investigate Father*

Highlighting that a primary goal of the CINA Subtitle is to protect children who fall under its provisions, CJ § 3-802(a)(1), WCDSS also urges that the ICPC must be interpreted as applying to parental placements because it provides the only mechanism for WCDSS and the court to investigate and obtain critical information about out-of-state, noncustodial parents like T.S. The juvenile court also stressed the same point. We are unpersuaded, but not simply because of our interpretation of the statute's plain language or our concern about the constitutional implications of applying the ICPC to fit parents. *First*, Maryland does have the option of requesting a courtesy check of the out-of-state, noncustodial parent's home. Regulation No. 3 contemplates this scenario by identifying a "parent placement with courtesy check" as outside the purview of the ICPC,[31] explaining that "[w]hen a sending court/agency seeks an independent (not ICPC related) courtesy

---

[31] Again, we have only invalidated Regulation No. 3 to the extent it purports to expand application of the ICPC to out-of-state placements with parents. We acknowledge that it addresses ICPC issues unrelated to parental placements.

check for placement with a parent from whom the child was not removed, the responsibility for credentials and quality of the 'courtesy check' rests directly with the sending court/agency and the person or party in the receiving state who agree [*sic*] to conduct the 'courtesy' check without invoking the protection of the ICPC home study process." Regulation No. 3(3)(b). "Courtesy check" is defined as a "[p]rocess that does not involve the ICPC, used by a sending court to check the home of a parent from whom the child was not removed." Regulation No. 3(4)(19). As such, a courtesy check appears to be another mechanism that WCDSS can use to ensure the safe transfer of a child to a noncustodial, out-of-state parent's care.

*Second*, while we can appreciate the difficulties that might arise when attempting to investigate a parent who lives across the country, the assertion that the fitness of father in this case was impossible for WCDSS to evaluate without the ICPC is belied by the record. Throughout the case, father lived just over the Maryland state line in Delaware and regularly made himself available to WCDSS. WCDSS reported that father "willingly presented himself as a resource" for R.S. as soon as his paternity was established, entered into a services agreement with WCDSS, underwent psychological and substance abuse evaluations at WCDSS's request, completed a parenting course with a WCDSS social worker, and maintained stable housing and employment. A WCDSS social worker also participated in many of father's monitored visits with R.S. By the final disposition hearing, WCDSS reported that father and R.S. were having successful overnight weekend visits in father's home and that R.S. accepted T.S. as her father, loved him, gave him kisses, and asked to speak with him on the telephone. This wealth of information supporting father's

fitness and ability to care for R.S. was all developed independently of the ICPC. Again, we are mindful that WCDSS will not always be dealing with such a willing and accessible out-of-state noncustodial parent. We, however, think it disingenuous for WCDSS to assert that the ICPC was the "only mechanism to enable [the] court to act in R.S.'s best interests" on the facts of this case.

### 3. Father's Relationship with R.S.

Finally, WCDSS repeatedly emphasizes that father had no relationship with R.S. at the outset of the case when justifying the application of the ICPC to R.S.'s possible placement in his care. When invoking the ICPC, the juvenile court also commented (or agreed with WCDSS) that it should not have had to immediately hand off R.S. to a father she hardly knew. WCDSS seems to contend that the ICPC, despite its plain language, should at least be interpreted as applying to out-of-state parents who lack an extensive relationship with their children. But we will not engage in such a forced interpretation of the ICPC, especially because WCDSS provides no clear legal authority for its implied assertion that, in Maryland CINA proceedings, the State can indefinitely keep a child out of the custody of a biological father solely by pointing to the father's lack of relationship with the child at the case's inception. *Cf. Donald W. v. Dep't of Child Safety*, 444 P.3d 258, 269 (Ariz. Ct. App. 2019) (concluding that a child welfare agency's "lack of knowledge" about out-of-state biological father's fitness "is not a basis to keep a child in out-of-home placement").

Instead, the CINA Subtitle is clear—a parent is defined as "a *natural* or adoptive parent whose parental rights have not been terminated." CJ § 3-801(t) (emphasis added).

34

As is apparent from that definition, no distinction is made between natural parents based on how thoroughly a parent is involved in the child's life. Furthermore, under CJ § 3-822(e), "CINA courts have the power to determine paternity … to identify the proper parties to the CINA proceeding." *In re B.C.*, 234 Md. App. 698, 718 (2017). The juvenile court did that here and found T.S. to be R.S.'s biological father and a proper party to the case in January 2017 after receiving the paternity test results. CJ § 3-822(e)(2) (juvenile court may "[m]ake a finding of paternity in accordance with Title 5, Subtitle 10, Part VI of the Family Law Article"); FL § 5-1029(f)(4) (positive results from blood and genetic tests constitute rebuttable presumptions of paternity). Thereafter, the juvenile court unquestionably could not declare R.S. a CINA and justify an out-of-home placement without making a supported finding that father—a natural parent and party to the case notwithstanding the extent of his relationship with R.S.—was "unable" to care for the child—a finding that it did not and could not make. *See* Section II.B.1, *supra*; CJ § 3-801(f), (t), & (u)(iii); CJ § 3-819(a)(1), (b)(iii), & (f).

In emphasizing this point, we take no position on whether a lack of relationship might, in some circumstances, necessitate an allegation and ultimate finding that a natural parent is "unable" to care for a child. CJ § 3-801(f); *but see In re D.B.*, 43 N.E.3d at 604-06 (concluding that father's lack of relationship with biological child was insufficient evidence for child welfare agency to prove child met Indiana's version of a CINA); *cf. In re Russell G.*, 108 Md. App. 366, 377-79 (1996) (noncustodial parent may be "unable" to care for child where noncustodial parent is aware of but disregards abuse or neglect by

35

custodial parent).[32] WCDSS and the juvenile court, however, cannot circumvent the required allegations and findings under the CINA Subtitle in reliance on the ICPC. Rather, the State must set forth facts and prove CINA petition allegations by a preponderance of the evidence, and "a more stringent standard of proof is required to deny custody" of a child to a parent at disposition. *In re Joseph G.*, 94 Md. App. 343, 347, 350 (1993); CJ § 3-817(c).

For at least three reasons, we also refuse to read into the record an implied judicial finding that father's lack of relationship with R.S. at the case's inception showed he was unable to care for her. *First*, the magistrate and WCDSS explicitly acknowledged at the adjudicatory hearing that the petition allegations "have nothing to do with [father]." *Second*, the magistrate expressly stated at the final disposition hearing that she was not making any finding concerning father's ability to care for the child. *Third*, there *was* a wealth of evidence showing that father and R.S. had a substantial, positive relationship by the date of the final disposition hearing, further supporting that he undisputedly was able to care for R.S. when the negative ICPC homestudy was used to deny him custody of the child.[33] In sum, we conclude that a parent's lack of relationship with a child at the inception

[32] On appeal, WCDSS appears to cast blame on father for not being involved in R.S.'s life until the CINA proceeding began. No evidence was presented below, however, showing that father knew, or should have known, about R.S.'s existence or his potential parenthood before that time, a fact otherwise conceded by WCDSS.

[33] In this regard, WCDSS's assertion that father's relationship with R.S. was not entitled to federal constitutional protection at the outset of the CINA proceeding misses the mark. In the case relied on by WCDSS, *Lehr v. Roberston*, the Supreme Court held that an unwed biological father's relationship with his child "acquires substantial protection under the due process clause" once the father "demonstrates a full commitment to the

of a CINA case does not provide an adequate justification for departing from the plain language of the ICPC and applying it to parental placements.

## CONCLUSION

In conclusion, we hold that the ICPC does not apply to the out-of-state placement of a child with a biological parent. Until the Maryland General Assembly says otherwise, we will not "add [to or] delete language" in the current ICPC "to reflect an intent not evidenced in the plain and unambiguous language of the statute," and we also will not "construe [the ICPC] with forced or subtle interpretations" that expand its application.[34]

---

responsibilities of parenthood by coming forward to participate in the rearing of his child." 463 U.S. 248, 261 (1983) (cleaned up). As reflected in WCDSS's own reports, father demonstrated a full commitment to R.S. as soon as his biological paternity was established, and by the final disposition hearing, he was having successful overnight, weekend visitation with R.S., who then recognized him as her father. Thus, even if father's relationship with R.S. was not protected under the federal constitution at the case's inception, it certainly deserved that protection by the time the juvenile court relied on the negative ICPC homestudy to deny him custody of R.S. In any event, as soon as father's paternity was established, he was an undisputed party to the CINA proceeding, and the juvenile court was at least bound to follow the CINA Subtitle in its dealings with him. CJ § 3-801(u)(1)(ii).

[34] The American Public Human Services Association (APHSA), the Secretariat of the AAICPC, convened a task force in July 2003 to reform the current version of the ICPC, in part, to address concerns "about the timeliness of the ICPC process and its 'overly broad' application." THE NEW ICPC, https://aphsa.org/AAICPC/AAICPC/ICPC.aspx, *preserved at* https://perma.cc/TM5Y-447V?type=image (last visited Aug 16, 2019) ("THE NEW ICPC"), APHSA Policy Resolution PDF. APHSA has since proposed a new version of the ICPC. THE NEW ICPC, New ICPC PDF. The new version generally provides that it applies to "the interstate placement of a child subject to ongoing court jurisdiction in the sending state, due to allegations or findings that the child has been abused [or] neglected." THE NEW ICPC, New ICPC PDF – Article III(A)(1). It then specifically exempts the "placement of a child with a non-custodial parent provided that: a. The non-custodial parent proves to the satisfaction of a court in the sending state a substantial relationship with the child; and b. The court in the sending state makes a written finding that placement with the non-custodial parent is in the best interests of the child; and c. The court in the sending state

*Lockshin*, 412 Md. at 275 (cleaned up); *see In re C.B.*, 188 Cal. App. 4th at 1027 (suggesting a "multistate legislative response" may be warranted to address the lack of uniformity on this ICPC issue).

We turn next to the appropriate remedy here. R.S. asks us to reverse the final custody order granting the paternal grandparents and father joint legal and physical custody of her and to remand the matter with directions to the juvenile court to award father sole custody. WCDSS, of course, asks us to affirm the joint custody order even if the ICPC was applied in error. We conclude the proper course is somewhere in the middle. Specifically, as our review of the record confirms, we agree with R.S. that there was never any finding (or even evidence showing) father was unfit when the negative ICPC was used at the final disposition hearing to deny R.S.'s and father's requests that R.S. be placed with him. Thus, under CJ § 3-819(e), father, as an able and willing parent, should have been awarded sole custody of R.S. at the final disposition hearing in June 2017.

But as is the case in many CINA appeals, we are unable to fully "turn back the clock," *In re O.P.*, 240 Md. App. 518, 553-54 (2019), *cert. granted*, *In re O.P.*, No. 76, Sept. Term 2019 (July 12, 2019), and we will not disregard the evidence in the record suggesting that, as of January 2019, father preferred to share custody of R.S. with his parents. As the record stands, we are uncertain whether that is really father's preference or

_____

dismisses its jurisdiction in interstate placements in which the public child placing agency is a party to the proceeding." THE NEW ICPC, New ICPC PDF – Article III(B)(5). The new ICPC, which has been enacted in 12 states, including Delaware, does not go into effect until it is adopted by 35 states. THE NEW ICPC.

whether father's stated willingness to share custody was the product of the errors that led to that point. Accordingly, we direct the juvenile court to vacate its disposition order declaring R.S. to be a CINA, as well as its final order granting joint custody of R.S. to father and the paternal grandparents. In lieu of immediately granting sole custody of R.S. to father pursuant to CJ § 3-819(e), however, the juvenile court shall conduct a hearing to determine father's actual custody preference in light of our holding that the ICPC never should have been applied to deny him sole custody of R.S. If father continues to prefer joint custody shared between himself and his parents, then the juvenile court may issue such an order. If not, then the juvenile court shall grant father, an undisputedly fit parent, sole custody of R.S. pursuant to CJ § 3-819(e).[35]

> **JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY VACATED AND MATTER REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

---

[35] Because of our resolution of the ICPC issues, we need not address whether the juvenile court erred in denying R.S.'s counsel closing argument at the final review hearing.

39